**LeClairRyan**
*A Professional Corporation*
One Riverfront Plaza
1037 Raymond Boulevard
Newark, New Jersey 07102
(973) 491-3600
Attorneys for Plaintiff, Howard Johnson International, Inc.

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| HOWARD JOHNSON INTERNATIONAL, INC., a Delaware Corporation, | : |
| Plaintiff, | :     Civil Action No. 17- |
| v. | : |
| SEVEN HILLS HOSPITALITY GROUP LLC, a New York Limited Liability Company; GAURANG PARIKH, an individual; and KIRAN DAVE, an individual, | :     **VERIFIED COMPLAINT** |
| Defendants. | : |

Plaintiff Howard Johnson International, Inc., by its attorneys, LeClairRyan, complaining of defendants, Seven Hills Hospitality Group LLC, Gaurang Parikh, and Kiran Dave, says:

### PARTIES, JURISDICTION AND VENUE

1.     Plaintiff Howard Johnson International, Inc. ("HJI") is a corporation organized and existing under the laws of the State of Delaware with its principal place of business in Parsippany, New Jersey.

2.     Defendant Seven Hills Hospitality Group LLC ("Seven Hills Hospitality"), on information and belief, is a limited liability company organized and existing under the laws of

the State of New York, with its principal place of business at 530 EAB Plaza, Uniondale, New York 11556.

3.      Defendant Gaurang Parikh ("Parikh"), on information and belief, is a member of Seven Hills Hospitality and a citizen of the State of New York, having an address at 530 EAB Plaza, Uniondale, New York 11556.

4.      Defendant Kiran Dave ("Dave"), on information and belief, is a member of Seven Hills Hospitality and a citizen of the State of New Jersey, having an address at 1560 Bergen Boulevard, Fort Lee, New Jersey 07024.

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 & 1338, 15 U.S.C. § 1121 and, with respect to certain claims, 28 U.S.C. § 1367.

6.      This Court has personal jurisdiction over Seven Hills Hospitality by virtue of, among other things, section 17.6.3 of the October 14, 2005 license agreement by and between Seven Hills Hospitality and HJI (the "License Agreement"), described in more detail below, pursuant to which Seven Hills Hospitality has consented "to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey . . . ."

7.      This Court has personal jurisdiction over Parikh and Dave by virtue of, among other things, the terms of a guaranty (the "Guaranty"), described in more detail below, pursuant to which Parikh and Dave acknowledged that they were personally bound by section 17 of the License Agreement.

8.      Venue is proper in this District pursuant to section 17.6.3 of the License Agreement, inasmuch as that provision contains an express waiver by Seven Hills Hospitality of any objection to venue in this District.

## ALLEGATIONS COMMON TO ALL COUNTS

### The Howard Johnson® Marks

9.      HJI is one of the largest guest lodging facility franchise systems in the United States, and is widely known as a provider of guest lodging facility services.

10.     HJI owns and has the exclusive right to license the use of the service mark HOWARD JOHNSON® and various related trade names and service marks (certain of which are on the principal register of the United States Patent and Trademark Office), logos, and derivations thereof (the "Howard Johnson® Marks"), as well as the distinctive HOWARD JOHNSON® System, which provides guest lodging services to the public under the HOWARD JOHNSON® name and certain services to its licensees, including a centralized reservation system, advertising, publicity, and training services.

11.     HJI or its predecessors first used the HOWARD JOHNSON® mark in connection with guest lodging services in 1954 and the Howard Johnson® Marks are in full force and effect. Certain of the registered Howard Johnson® Marks are incontestable pursuant to 15 U.S.C. § 1065.

12.     HJI has given notice to the public of the registration of the Howard Johnson® Marks as provided in 15 U.S.C. § 1111.

13.     HJI uses or has used the words "Howard Johnson," "Howard Johnson Plaza-Hotels," "Hojo Express," and "HoJo Inn," among others, as abbreviations of its brand name.

14.     HJI has registered the Howard Johnson® Marks as service marks with the US Patent and Trademark Office ("USPTO") and owns, among others, the following valid service mark registrations for the Howard Johnson® Marks:

| MARK | DESIGN | REGISTRATION NO | REGISTRATION DATE | CLASS |
|------|--------|-----------------|-------------------|-------|
| 1-800-I-GO-HOJO | | 2077076 | Jul-8-1997 | 42 |
| HOJO | | 3744506 | Feb-2-2010 | 43 |
| HOWARD JOHNSON | | 2010109 | Oct-22-1996 | 35 |
| HOWARD JOHNSON & FLOURISH DESIGN | | 2351850 | May-23-2000 | 42 |
| HOWARD JOHNSON HOME OFFICE & DESIGN | | 2413621 | Dec-19-2000 | 42 |
| HOWARD JOHNSON RISE & DINE | | 3169462 | Nov-7-2006 | 43 |
| HOWARD JOHNSON RISE & DINE & Design | | 3074608 | Mar-28-2006 | 43 |
| HOWARD JOHNSON STYLIZED & SMALL SHIELD DESIGN | | 2239260 | Apr-13-1999 | 35, 42 |
| HOWARD JOHNSON STYLIZED & SMALL SHIELD DESIGN | | 2351849 | May-23-2000 | 35, 42 |

| HOWARD JOHNSON STYLIZED & SMALL SHIELD DESIGN | | 2351852 | May-23-2000 | 35, 42 |
| "ROOFTOP & SUNBURST DESIGN" | | 2351851 | May-23-2000 | 35, 42 |

15.     The USPTO registrations for the Howard Johnson® Marks are valid, subsisting and in full force and effect and appear on the Principal Trademark Register of the USPTO.  All of the Howard Johnson® Marks have achieved incontestable status pursuant to the Lanham Act, 15 U.S.C. § 1065.  Such incontestable federal registrations for the Howard Johnson® Marks constitute conclusive evidence of the validity of the Howard Johnson® Marks and HJI's ownership of the Howard Johnson® Marks and the exclusive right to use the marks nationwide.

16.     Through its franchise system, HJI markets, promotes, and provides services to its guest lodging licensees throughout the United States.  In order to identify the origin of their guest lodging services, HJI allows its licensees to utilize the Howard Johnson® Marks and to promote the Howard Johnson® brand name.

17.     HJI has invested substantial effort over a long period of time, including the expenditure of millions of dollars, to develop goodwill in its trade names and service marks to cause consumers throughout the United States to recognize the Howard Johnson® Marks as distinctly designating HJI guest lodging services as originating with HJI.

18.     The value of the goodwill developed in the Howard Johnson® Marks does not admit of precise monetary calculation, but because HJI is one of the largest guest lodging facility

franchise systems in the United States and is widely known as a provider of guest lodging facility services, the value of HJI's goodwill exceeds hundreds of millions of dollars.

19.     The Howard Johnson® Marks are indisputably among the most famous in the United States.

## The Agreements Between The Parties

20.     On or about October 14, 2005, HJI entered into the License Agreement with Seven Hills Hospitality for the operation of a 43-room[1] Howard Johnson® guest lodging facility located at 1300 Sedgwick Avenue, Bronx, New York 10452, designated as Site No. 15561-60252-01 (the "Facility").  A true copy of the License Agreement is attached hereto as Exhibit A.

21.     Pursuant to section 5 of the License Agreement, Seven Hills Hospitality was obligated to operate a Howard Johnson® guest lodging facility for a twenty-year term, during which time Seven Hills Hospitality was permitted to use the Howard Johnson® Marks in association with the operation and use of the Facility as part of HJI's franchise system.

22.     Pursuant to section 7, section 18.1, and Schedule C of the License Agreement, Seven Hills Hospitality was required to make certain periodic payments to HJI for royalties, marketing contributions, room sales charges, taxes, interest, and other fees (collectively, "Recurring Fees").

23.     Pursuant to amendments dated October 29, 2008 (the "2008 Amendment") and March 30, 2009 (the "2009 Amendment"), the parties amended section 18.1.2 of the License Agreement to modify the total Recurring Fees Seven Hills Hospitality was obligated to pay HJI

---

[1] By letter amendment executed May 5, 2006 (the "2006 Amendment"), a copy of which is attached hereto as Exhibit B, the parties amended Schedule B of the License Agreement to reflect that the number of guest rooms at the Facility increased from 43 rooms to 45 rooms.

from March 10, 2008 through April 30, 2012.  True copies of the 2008 Amendment and 2009 Amendment are attached hereto as Exhibit C.

24.     Pursuant to an amendment dated December 11, 2012 (the "2012 Amendment"), the parties amended the License Agreement to include section 18.8, which modified the total Recurring Fees Seven Hills Hospitality was obligated to pay HJI from May 1, 2012 through April 30, 2025.  A true copy of the 2012 Amendment is attached hereto as Exhibit D.

25.     Pursuant to section 7.3 of the License Agreement, Seven Hills Hospitality agreed that interest is payable "on any past due amount payable to [HJI] under this [License] Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid."

26.     Pursuant to section 3.8 of the License Agreement, Seven Hills Hospitality was required to disclose to HJI, among other things, the amount of gross room revenue earned by Seven Hills Hospitality at the Facility for purposes of establishing the amount of royalties and other Recurring Fees due to HJI.

27.     Pursuant to section 3.8 of the License Agreement, Seven Hills Hospitality agreed to maintain at the Facility accurate financial information, including books, records, and accounts, relating to the gross room revenue of the Facility and, pursuant to sections 3.8 and 4.8 of the License Agreement, Seven Hills Hospitality agreed to allow HJI to examine, audit, and make copies of the entries in these books, records, and accounts.

28.     Pursuant to section 11.2 of the License Agreement, HJI could terminate the License Agreement, with notice to Seven Hills Hospitality, if Seven Hills Hospitality (a) discontinued operating the Facility as a Howard Johnson® guest lodging establishment, and/or (b) lost possession or the right to possession of the Facility.

29.     Pursuant to section 12.1 of the License Agreement, Seven Hills Hospitality agreed that, in the event of a termination of the License Agreement pursuant to section 11.2, it would pay liquidated damages to HJI in accordance with a formula specified in the License Agreement.

30.     Section 13 of the License Agreement specified Seven Hills Hospitality's obligations in the event of a termination of the License Agreement, including its obligation to immediately cease using all of the Howard Johnson® Marks.

31.     Pursuant to section 17.4 of the License Agreement, Seven Hills Hospitality agreed that the non-prevailing party would "pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this [License] Agreement or collect amounts owed under this [License] Agreement."

32.     Effective as of the date of the License Agreement, Parikh and Dave provided HJI with a Guaranty of Seven Hills Hospitality's obligations under the License Agreement.  A true copy of the Guaranty is attached hereto as <u>Exhibit E</u>.

33.     Pursuant to the terms of the Guaranty, Parikh and Dave agreed, among other things, that upon a default under the License Agreement, they would "immediately make each payment and perform or cause [Seven Hills Hospitality] to perform, each unpaid or unperformed obligation of [Seven Hills Hospitality] under the [License] Agreement."

34.     Pursuant to the terms of the Guaranty, Parikh and Dave agreed to pay the costs, including reasonable attorneys' fees, incurred by HJI in enforcing its rights or remedies under the Guaranty or the License Agreement.

## The Termination of the License Agreement

35.     On or about December 1, 2016, Seven Hills Hospitality unilaterally terminated the License Agreement by ceasing to operate the Facility as a Howard Johnson® guest lodging facility.

36.     By letter dated December 30, 2016, a true copy of which is attached as Exhibit F, HJI acknowledged Seven Hills Hospitality's unilateral termination of the License Agreement, effective December 1, 2016, and advised Seven Hills Hospitality that (a) it had to de-identify the Facility within ten (10) days from the delivery of the notice; (b) it was required to pay to HJI as liquidated damages for premature termination the sum of $120,532.67 as required under the License Agreement; and (c) demand was made for all outstanding Recurring Fees through the date of termination.

37.     The termination of the License Agreement precludes Seven Hills Hospitality from any further use of the Howard Johnson® Marks in or around the Facility.

38.     The termination of the License Agreement precludes Seven Hills Hospitality from any further use of the Howard Johnson® Marks to induce the traveling public to use the Facility in any way.

39.     Following the  termination of the License Agreement throu gh May 25, 2017, Seven Hills Hospitality continued to use the Howard Johnson® Marks to induce the traveling public to rent guest rooms at the Facility.

40.     Following the termination of the License Agreement through May 25, 2017, Seven Hills Hospitality used the Howard Johnson® Marks without authorization to rent rooms through, among other things, failure to remove Howard Johnson® signage and continuing to identify the Facility as a Howard Johnson® guest lodging facility.

41.     Seven Hills Hospitality continued to misuse the Howard Johnson® Marks through May 25, 2017, despite receiving notification from HJI to cease and desist from the misuse of the Howard Johnson® Marks.

## FIRST COUNT

42.     HJI repeats and makes a part hereof each and every allegation set forth in paragraphs 1 through 41 of the Verified Complaint.

43.     Section 32 of the Lanham Act, 15 U.S.C. § 1114(1)(a), provides in pertinent part that "[a]ny person who shall, without the consent of the registrant — use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive . . . shall be liable in a civil action by the registrant . . . ."

44.     Following the termination of the License Agreement throu gh May 25, 2017, Seven Hills Hospitality marketed, promoted, and rented rooms at the Facility through the unauthorized use of the Howard Johnson® Marks, and such use caused confusion or mistake among prospective or actual customers, in violation of Section 32 of the Lanham Act.

45.     Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), provides in pertinent part that "[a]ny person who, on or in connection with any goods or services . . . uses in commerce any word, term, name, symbol . . . or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which is likely to cause confusion, or to cause mistake, or to deceive as to affiliation . . . or as to the origin, sponsorship, or approval of . . . goods and/or services . . . shall be liable in a civil action . . . ."

46.     The acts of Seven Hills Hospitality in marketing, promoting, and renting rooms at the Facility, through and with the Howard Johnson® Marks, constitute:

> (a) a false designation of origin;
>
> (b) a false and misleading description of fact; and
>
> (c) a false and misleading representation of fact;

that caused confusion, mistake, and/or deception, as to the affiliation of Seven Hills Hospitality's Facility with HJI, and caused confusion, mistake, and/or deception, that HJI sponsored or approved of the guest lodging services that Seven Hills Hospitality provides at the Facility, all in violation of Section 43(a) of the Lanham Act.

47.     Section 43(c) of the Lanham Act, 15 U.S.C. § 1125(c), provides in pertinent part that "[t]he owner of a famous mark shall be entitled, subject to the principles of equity and upon such terms as the court deems reasonable, to an injunction against another person's commercial use in commerce of a mark or trade name, if such use begins after the mark has become famous and causes dilution of the distinctive quality of the mark, and to obtain such other relief as is provided in this subsection."

48.     Following the termination of the License Agreement through May 25, 2017, Seven Hills Hospitality's use of the Howard Johnson® Marks in connection with goods and services at the Facility, after the Howard Johnson® Marks became famous, caused dilution and disparagement of the distinctive quality of the Howard Johnson® Mar ks, and lessened the capacity of the Howard Johnson® Marks to identify and distinguish the goods and services of HJI, all in violation of Section 43(c) of the Lanham Act.

49.     Seven Hills Hospitality's acts of infringement in violation of Sections 32, 43(a), and 43(c) of the Lanham Act were malicious, fraudulent, willful, and deliberate.

50. Seven Hills Hospitality's acts of infringement in violation of Sections 32, 43(a), and 43(c) of the Lanham Act inflicted irreparable harm on HJI.

51. HJI has no adequate remedy at law.

**WHEREFORE**, pursuant to 15 U.S.C. §§ 1114, and 1125(a) & (c), HJI demands judgment against Seven Hills Hospitality granting compensatory damages, treble damages, attorneys' fees, prejudgment interest, costs of suit, and such other and further relief as this Court shall deem just and proper.

## SECOND COUNT

52. HJI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 51 of the Verified Complaint.

53. Pursuant to sections 3.8 and 4.8 of the License Agreement, Seven Hills Hospitality agreed to allow HJI to examine, audit, and make copies of Seven Hills Hospitality's financial information, including books, records, and accounts, relating to the gross room revenue earned at the Facility.

54. Seven Hills Hospitality engaged in acts and practices, as described, which amount to infringement of the Howard Johnson® Marks in an unlawful, unfair, and fraudulent manner.

55. As a result, Seven Hills Hospitality owes restitution and the disgorgement of profits, in an amount unknown to HJI, and which amount cannot be ascertained without an accounting of the receipts and disbursements, profit and loss statements, and other financial materials, statements and books from Seven Hills Hospitality.

**WHEREFORE**, HJI demands judgment ordering that Seven Hills Hospitality account to HJI for any and all revenue derived as a result of marketing, promoting, or selling guest lodging services at the Facility through and with the Howard Johnson® Marks.

## THIRD COUNT

56.     HJI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 55 of the Verified Complaint.

57.     On or about December 1, 2016, Seven Hills Hospitality unilaterally terminated the License Agreement by ceasing to operate the Facility as a Howard Johnson® guest lodging facility.

58.     By letter dated December 30, 2016, HJI acknowledged Seven Hills Hospitality's unilateral termination of the License Agreement, effective December 1, 2016.

59.     Section 12.1 of the License Agreement provides that, in the event of termination of the License Agreement due to action of the Licensee, Seven Hills Hospitality shall pay liquidated damages to HJI within 30 days of termination.

60.     As a result of the termination of the License Agreement, Seven Hills Hospitality is obligated to pay HJI liquidated damages in the amount of $120,532.67, as calculated pursuant to section 12.1 of the License Agreement.

61.     Notwithstanding HJI's demand for payment, Seven Hills Hospitality has failed to pay HJI the liquidated damages as required in section 12.1 of the License Agreement.

62.     HJI has been damaged by Seven Hills Hospitality's failure to pay liquidated damages.

**WHEREFORE**, HJI demands judgment against Seven Hills Hospitality for liquidated damages in the amount of $120,532.67, together with interest, attorneys' fees, and costs of suit.

## FOURTH COUNT

63.     HJI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 62 of the Verified Complaint.

64.     By virtue of the premature termination of the License Agreement, HJI sustained a loss of future revenue over the remainder of the twenty-year term of the License Agreement.

65.     If the Court determines that Seven Hills Hospitality is not liable to pay HJI liquidated damages as required by section 12.1 of the License Agreement then, in the alternative, Seven Hills Hospitality is liable to HJI for actual damages for the premature termination of the License Agreement.

66.     HJI has been damaged by Seven Hills Hospitality's breach of its obligation to operate a Howard Johnson® guest lodging facility for the remaining term of the License Agreement.

**WHEREFORE**, HJI demands judgment against Seven Hills Hospitality for actual damages in an amount to be determined at trial, together with interest, attorneys' fees, and costs of suit.

## FIFTH COUNT

67.     HJI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 66 of the Verified Complaint.

68.     Pursuant to section 7, section 18.1, section 18.8, and Schedule C of the License Agreement, Seven Hills Hospitality was obligated to remit Recurring Fees to HJI.

69.     Despite its obligation to do so, Seven Hills Hospitality failed to remit certain of the Recurring Fees due and owing under the License Agreement, in the current amount of $28,327.45.

70.     Seven Hills Hospitality's failure to remit the agreed Recurring Fees constitutes a breach of the License Agreement and has damaged HJI.

**WHEREFORE**, HJI demands judgment against Seven Hills Hospitality for the Recurring Fees due and owing under the License Agreement, in the current amount of $28,327.45, together with interest, attorneys' fees, and costs of suit.

## SIXTH COUNT

71.     HJI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 70 of the Verified Complaint.

72.     At the time of the termination of the License Agreement, Seven Hills Hospitality was obligated to pay HJI Recurring Fees.

73.     Despite its obligation to do so, Seven Hills Hospitality failed to pay certain of the Recurring Fees due and owing under the License Agreement, in the current amount of $28,327.45.

74.     In addition, Seven Hills Hospitality b enefited from its wrongful use of the Howard Johnson® Marks after termination of the License Agreement and paid no royalty or other Recurring Fees to HJI in return for that benefit.

75.     Seven Hills Hospitality's failure to compensate HJI constitutes unjust enrichment and has damaged HJI.

**WHEREFORE**, HJI demands judgment against Seven Hills Hospitality for the Recurring Fees due and owing under the License Agreement, in the current amount of $28,327.45, and all royalties and other Recurring Fees that should be paid to compensate HJI for the period during which Seven Hills Hospitality misused the Howard Johnson® Marks and was thereby unjustly enriched, together with interest, attorneys' fees, and costs of suit.

## SEVENTH COUNT

76.     HJI repeats and makes a part hereof each and every allegation contained in paragraphs 1 through 75 of the Verified Complaint.

77.     Pursuant to the terms of the Guaranty, Parikh and Dave agreed, among other things, that upon a default under the License Agreement, they would immediately make each payment and perform each obligation required of Seven Hills Hospitality under the License Agreement.

78.     Despite their obligation to do so, Parikh and Dave have failed to make any payments or perform or cause Seven Hills Hospitality to perform each obligation required under the License Agreement.

79.     Pursuant to the Guaranty, Parikh and Dave are liable to HJI for Seven Hills Hospitality's liquidated damages in the amount of $120,532.67, or actual damages in an amount to be determined at trial, Seven Hills Hospitality's Recurring Fees due and owing under the License Agreement, in the current amount of $28,327.45, and for those additional Recurring Fees attributable to the period during which Seven Hills Hospitality misused the Howard Johnson® Marks.

**WHEREFORE**, HJI demands judgment against Parikh a nd Dave f or damages in the amount of:

(a)     All liquidated damages, or actual damages, and Recurring Fees due and owing under the License Agreement, together with interest, attorneys' fees, and costs of suit; and

(b)     All profits, royalties, and other Recurring Fees that should be paid to compensate HJI for the period during which Seven Hills Hospitality misused the Howard Johnson® Marks and was thereby unjustly enriched, together with interest, attorneys' fees, and costs of suit.

LeClairRyan
Attorneys for Plaintiff,
Howard Johnson International, Inc.

By: _____
**BRYAN P. COUCH**

Dated: 6/26/17

## CERTIFICATION PURSUANT TO L. CIV. R. 11.2

I certify that, to the best of my knowledge, this matter is not the subject of any other action

pending in any court or of any pending arbitration or administrative proceeding.

LeClairRyan
Attorneys for Plaintiff,
Howard Johnson International, Inc.

By: _____
**BRYAN P. COUCH**

Dated: 6/26/17

- 17 -

## VERIFICATION

STATE OF NEW JERSEY    )
                               ) ss:
COUNTY OF MORRIS        )

Suzanne Fenimore, of full age, being duly sworn according to law, upon her oath, deposes and says:

I am Senior Director of Contracts Compliance for Howard Johnson International, Inc., which is plaintiff in this action.

I have read the foregoing Verified Complaint and all the allegations contained therein. Except as to allegations alleged upon information and belief, which allegations I believe to be true, all the allegations in the Verified Complaint are true based on my personal knowledge, the records of HJI or information available through employees of HJI.

_____
SUZANNE FENIMORE

Sworn and subscribed to before
me this 7th day of July , 2017

_____
NOTARY PUBLIC

KAREN A. BROMM
NOTARY PUBLIC
STATE OF NEW JERSEY
ID # 2283264
MY COMMISSION EXPIRES JAN. 24, 2022

# EXHIBIT A

Location: BRONX, NY
Entity No. 60 252
Unit No.: 15561

## HOWARD JOHNSON INTERNATIONAL, INC.
## LICENSE AGREEMENT

THIS LICENSE AGREEMENT ("Agreement"), dated Oct. 14____, 2005, is between HOWARD JOHNSON INTERNATIONAL, INC., a Delaware corporation ("we", "our" or "us"), and **SEVEN HILLS HOSPITALITY GROUP LLC, a __NY__ limited liability company** ("you"). The definitions of capitalized terms are found in Appendix A. In consideration of the following mutual promises, the parties agree as follows:

**1. License.** We have the exclusive right to license and franchise to you the distinctive "Howard Johnson" System for providing transient guest lodging services. We grant to you and you accept the License, effective and commencing on the Opening Date and ending on the earliest to occur of the Term's expiration or a Termination. You will call the Facility a **"Howard Johnson Inn."** You may adopt addition or secondary designations for the Facility with our prior written consent, which we may withhold, condition, or withdraw on written notice in our sole discretion. You shall not affiliate or identify the Facility with another franchise system, reservation system, brand, cooperative or registered mark during the Term.

**2. International Operators Council, Inc.** You are automatically a member of the INOC and are entitled to vote at its meetings on the basis of one Chain Facility, one vote. The purpose of the INOC will be to consider, discuss, and make recommendations on common issues relating to the operation of Chain Facilities. We will seek the advice and counsel of the INOC Board of Directors and its various committees. We will assist the INOC to function in a manner consistent with the best interests of the Chain, and to adopt its governing rules to be consistent with the best interests of the Chain.

**3. Your Improvement and Operating Obligations.** Your obligations to improve, operate and maintain the Facility are:

3.1 **Improvements.** (a) You must select and acquire the Location and acquire, design, construct, equip and supply the Facility in accordance with the Approved Plans, Schedule B and System Standards. You will provide proof of ownership or a ground lease of the Location before or within 30 days after the Effective Date. You will commence construction of the Facility no later than sixty (60) days after the Effective Date and complete construction and properly deliver the Certification as described in paragraph (b) of this Section no later than six (6) months from the Effective Date. Your general contractor or you must carry the insurance required under this Agreement during construction. We may, at our option, terminate this Agreement by written notice to you if you do not meet these deadlines. We may, in our sole discretion, grant extensions of time to perform any phase of the Improvement Obligation. You will pay us an extension fee equal to $2.00 times the number of guest rooms in the Facility for each day of any extension of the deadline for opening the Facility. This Fee will be payable to us after each 30 days of the extension. You will pay us any extension fee outstanding when the Facility opens 10 days after the Opening Date. The Initial Fee described in Section 6 is not refundable. Construction commences, for purposes of this Section, when all of the following occur: (x) We

1

approve a site plan, completed working drawings and detail specifications for the Facility; (y) Governmental permits are issued to commence foundation construction; and (z) You commence pouring concrete for building footings.

(b)  You must design, construct and equip, then operate and maintain the Facility in compliance with the Americans with Disabilities Act, as amended (42 U.S.C. Sec. 12181) and the related Federal regulations (28 C.F.R. Part 36) (collectively, the "ADA").   Before we authorize you to open the Facility, you must complete and submit the Certification of ADA Compliance in the form attached as Exhibit B (the "Certification").   You must complete the Certification per its instructions and submit it to us only after it has been signed by your general contractor or either your architect of record or a consulting architect you hire for the Certification.  If you cannot obtain the signature of the contractor or such an architect for the Certification, you must sign the Licensee's Certification of Compliance on the signature page of the Certification.  The Certification contains a checklist of ADA related matters that you must address in developing and completing the Facility.  If we determine that the Certification has not been properly completed, or if we have actual knowledge (not constructive or implied knowledge) that the signatures on the Certification are false or fraudulent, we will return the Certification to you with written notice that we will not permit you to open the Facility for business under the System until we receive a properly completed Certification.  We may terminate this Agreement under paragraph (a) of this Section 3.1 or Section 11 if you do not submit the Certification properly completed before you open the Facility under the System, you fail to meet the deadline for completing the Facility specified in paragraph (a) of this Section because you do not submit a properly completed Certification, or if you submit a false or fraudulent Certification.   We will delay the Opening Date until you submit the properly completed Certification.  We shall not be liable to you or any third party if the Certification is improperly completed or the Facility is not built or operated in compliance with ADA.

3.2  **Improvement Plans.**  You will create plans and specifications for the work described in Section 3.1 (based upon the System Standards and this Agreement) if we so request and submit them for our approval before starting improvement of the Location.  We will not unreasonably withhold or delay our approval, which is intended only to test compliance with System Standards, and not to detect errors or omissions in the work of your architects, engineers, contractors or the like.  Our review does not cover technical, architectural or engineering factors, or compliance with federal, state or local laws, regulations or code requirements.  We will not be liable to your lenders, contractors, employees, guests, others or you on account of our review or approval of your plans, drawings or specifications, or our inspection of the Facility before, during or after renovation or construction.  Any material variation from the Approved Plans requires our prior written approval. You will promptly provide us with copies of permits, job progress reports, and other information as we may reasonably request. We may inspect the work while in progress without prior notice.

3.3    **Pre-Opening.**  You may identify the Facility as a Chain Facility prior to the Opening Date, or commence operation of the Facility under a Mark and using the System, only after first complying with Section 3.1, paragraph (b), and obtaining our approval or as permitted under and strictly in accordance with the System Standards Manual.

3.4  **Operation.**  You will operate and maintain the Facility continuously after the Opening Date on a year-round basis as required by System Standards and offer transient guest lodging and

2

other related services of the Facility (including those specified on Schedule B) to the public in compliance with the law and System Standards. You will keep the Facility in a clean, neat, and sanitary condition. You will clean, repair, replace, renovate, refurbish, paint, and redecorate the Facility and its FF&E as and when needed to comply with System Standards. The Facility will be managed by either a management company or an individual manager with significant training and experience in general management of similar lodging facilities. The Facility will accept payment from guests by all credit and debit cards we designate in the System Standards Manual. You may add to or discontinue the amenities, services and facilities described in Schedule B, or lease or subcontract any service or portion of the Facility, only with our prior written consent which we will not unreasonably withhold or delay. Your front desk operation, telephone system, parking lot, swimming pool and other guest service facilities may not be shared with or used by guests of another lodging or housing facility.

3.5  **Training.** You (or a person with executive authority if you are an entity) and the Facility's general manager (or other representative who exercises day to day operational authority) will attend the training programs described in Section 4.1 we designate as mandatory for licensees and general managers, respectively. You will train or cause the training of all Facility personnel as and when required by System Standards and this Agreement. You will pay for all travel, lodging, meals and compensation expenses of the people you send for training programs, the cost of training materials and other reasonable charges we may impose for training under Section 4.1, and all travel, lodging, meal and facility and equipment rental expenses of our representatives if training is provided at the Facility.

3.6  **Marketing.**

3.6.1  You will participate in System marketing programs, including the Directory and the Reservation System. You will obtain and maintain the computer and communications service and equipment we specify to participate in the Reservation System. You will comply with our rules and standards for participation, and will honor reservations and commitments to guests and travel industry participants. You authorize us to offer and sell reservations for rooms and services at the Facility according to the rules of participation and System Standards. You may implement, at your option and expense, your own local advertising. Your advertising materials must use the Marks correctly, and must comply with System Standards or be approved in writing by us prior to publication. You will stop using any non-conforming, out-dated or misleading advertising materials if we so request.

3.6.2  You may participate in any regional marketing training or management alliance or cooperative of Chain licensees formed to serve the Chain Facilities in your area. We may assist the cooperative collect contributions. You may be excluded from cooperative programs and benefits if you don't participate in all cooperative programs according to their terms, including making payments and contributions when due.

3.6.3  You will participate in marketing programs approved by the INOC Board of Directors. These may require you to pay transaction or other fees to support guest rewards and other incentive programs.

3.6.4  The Facility must participate in our Chain-wide Internet marketing activities like other marketing programs. You will discontinue any Internet marketing that conflicts, in our

3

reasonable discretion, with Chain-wide Internet marketing activities. You must honor the terms of any participation agreement you sign for Internet marketing. You shall pay when due any fees, commissions, charges and reimbursements relating to Internet marketing activities (i) in which you agree to participate, or (ii) that we designate as mandatory on a Chain-wide basis, provided that the activities carry aggregate fees per transaction of not more than the sum of the full agent commission specified on Schedule C for sales agents, plus 10% of the Chain's reported average daily rate for the preceding calendar year. We may suspend the Facility's participation in Internet marketing activity if you default under this Agreement.

**3.7  Governmental Matters.**  You will obtain as and when needed all governmental permits, licenses and consents required by law to construct, acquire, renovate, operate and maintain the Facility and to offer all services you advertise or promote. You will pay when due or properly contest all federal, state and local payroll, withholding, unemployment, beverage, permit, license, property, ad valorem and other taxes, assessments, fees, charges, penalties and interest, and will file when due all governmental returns, notices and other filings. You will comply with all applicable federal, state and local laws, regulations and orders applicable to you and/or the Facility, including those combating terrorism such as the USA Patriot Act and Executive Order 13224.

**3.8  Financial Books & Records; Audits.**

3.8.1  The Facility's transactions must be timely and accurately recorded in accounting books and records prepared on an accrual basis compliant with generally accepted accounting principles of the United States ("GAAP") and consistent with the most recent edition of the Uniform System of Accounts for the Lodging Industry published by the American Hotel & Motel Association, as modified by this Agreement and System Standards. You acknowledge that your accurate accounting for and reporting of Gross Room Revenues is a material obligation you accept under this Agreement.

3.8.2  We may notify you of a date on which we propose to audit the Facility's books and records. You will be deemed to confirm our proposed date unless you follow the instructions with the audit notice for changing the date. You need to inform us where the books and records will be produced. You need to produce for our auditors at the confirmed time and place for the audit the books, records, tax returns and financial statements relating to the Facility for the applicable accounting periods we require under this Agreement and System Standards. If our auditors must return to your location after the first date we confirm for the audit because you violate this Section 3.8.2 or refuse to cooperate with the reasonable requests of our auditors, you must pay us the Audit Fee under Section 4.8 when invoiced. We may also perform an audit of the Facility's books and records without advance notice. Your staff must cooperate with and assist our auditors to perform any audit we conduct.

3.8.3  We will notify you in writing if you default under this Agreement because (i) you do not cure a violation of Section 3.8.2 within 30 days after the date of the initial audit, (ii) you cancel 2 or more previously scheduled audits, (iii) you refuse to admit our auditors for an audit during normal business hours at the place where you maintain the Facility's books and records, or refuse to produce the books and records required under this Agreement and System Standards for the applicable accounting periods, (iv) our audit determines that the books and records you produced are incomplete or show evidence of tampering or violation of generally accepted internal control

procedures, or (v) our audit determines that that you have reported to us less than 97% of the Facility's Gross Room Revenues for any fiscal year preceding the audit. Our notice of default may include, in our sole discretion and as part of your performance needed to cure the default under this Section 3.8, an "Accounting Procedure Notice." You must also pay any deficiency in Recurring Fees or other charges we identify and invoice as a result of the audit. The Accounting Procedure Notice requires that you obtain and deliver to us, within 90 days after the end of each of your next three fiscal years ending after the Accounting Procedure Notice, an audit opinion signed by an independent certified public accountant who is a member of the American Institute of Certified Public Accountants addressed to us that the Facility's Gross Room Revenues you reported to us during the fiscal year fairly present the Gross Room Revenues of the Facility computed in accordance with this Agreement for the fiscal year.

3.9   **Inspections.**   You acknowledge that the Facility's participation in our quality assurance inspection program (including unannounced inspections) is a material obligation you accept under this Agreement.   You will permit our representatives to perform quality assurance inspections of the Facility at any time with or without advance notice.   The inspections will commence during normal business hours although we may observe Facility operation at any time. You and the Facility staff will cooperate with the inspector performing the inspection.  If the Facility fails an inspection, you refuse to cooperate with our inspector, or you refuse to comply with our published inspection System Standards, then you will pay us when invoiced for any reinspection fee specified in System Standards Manuals (which is $750 on the Effective Date and will not exceed $2,500) plus the reasonable travel, lodging and meal costs our inspector incurs for a reinspection.  We may also conduct paper and electronic customer satisfaction surveys of your guests and include the results in your final quality assurance score.  We may publish and disclose the results of quality assurance inspections and guest surveys.

3.10  **Insurance.**  You will obtain and maintain during the Term of this Agreement the insurance coverage required under the System Standards Manual from insurers meeting the standards established in the Manual.  Unless we instruct you otherwise, your liability insurance policies will name Howard Johnson International, Inc., Cendant Hotel Group, Inc. and Cendant Corporation, their successors and assigns as additional insureds.

3.11  **Conferences.**   You or your representative and your general manager will attend each annual Chain conference and pay the Conference Fee we set for the Chain licensees, if and when we or the INOC Board of Directors hold an annual Chain conference.  Mandatory recurrent training for licensees and general managers described in Section 4.1.3 may be held at a conference.  The Fee we set will be the same for all Chain Facilities that we license in the United States.  You will receive reasonable notice of a Chain conference.  You will pay one Conference Fee for all of the Chain Facilities you own.

3.12  **Purchasing.**  You will purchase or obtain certain items we designate as proprietary or that bear Marks, such as signage, only from suppliers we approve.  You may purchase any other items for the Facility from any competent source you select, so long as the items meet or exceed System Standards.

3.13  **Good Will.**  You will use reasonable efforts to protect, maintain and promote the name "Howard Johnson" and its distinguishing characteristics, and the other Marks.  You will not permit or allow your officers, directors, principals, employees, representatives, or guests of the

HJEXCI
179820.3  Q2/05

Facility to engage in conduct which is unlawful or damaging to the good will or public image of the Chain or System. You will participate in Chain-wide guest service and satisfaction guaranty programs we require in good faith for all Chain Facilities. You will follow System Standards for identification of the Facility and for you to avoid confusion on the part of guests, creditors, lenders, investors and the public as to your ownership and operation of the Facility, and the identity of your owners.

3.14  **Facility Modifications.** You may materially modify, diminish or expand the Facility (or change its interior design, layout, FF&E, or facilities) only after you receive our prior written consent, which we will not unreasonably withhold or delay. You will pay our Rooms Addition Fee then in effect for each guest room you add to the Facility. If we so request, you will obtain our prior written approval of the plans and specifications for any material modification, which we will not unreasonably withhold or delay. You will not open to the public any material modification until we inspect it for compliance with the Approved Plans and System Standards.

3.15  **Courtesy Lodging.** You will provide lodging at the "Employee Rate" established in the System Standards Manual from time to time (but only to the extent that adequate room vacancies exist) to our representatives traveling on business, but not more than three standard guest rooms at the same time.

3.16  **Minor Renovations.** Beginning three years after the Opening Date, we may issue a "Minor Renovation Notice" to you that will specify reasonable Facility upgrading and renovation requirements (a "Minor Renovation") to be commenced no sooner than 60 days after the notice is issued, having an aggregate cost for labor, FF&E and materials estimated by us to be not more than the Minor Renovation Ceiling Amount. You will perform the Minor Renovations as and when the Minor Renovation Notice requires. We will not issue a Minor Renovation Notice within three years after the date of a prior Minor Renovation Notice, or if the three most recent quality assurance inspection scores of the Facility averaged no more than 200 points and the most recent quality assurance inspection score for the Facility was no more than 225 points (or equivalent scores under a successor quality assurance scoring system we employ), when the Facility is otherwise eligible for a Minor Renovation.

4.  **Our Operating and Service Obligations.** We will provide you with the following services and assistance:

4.1  **Training.** We may offer (directly or indirectly by subcontracting with an affiliate or a third party) general manager and owner orientation training, on-site opening training, remedial training and supplemental training.

4.1.1  **General Manager Orientation Training.** We will offer at a location in the United States we designate a general manager orientation training program. The program will not exceed two weeks in duration and will cover such topics as System Standards, services available from us, and operating a Chain Facility. Your initial general manager (or other representative who exercises day to day operational authority) for the Facility must complete this program to our satisfaction no later than 90 days after he/she assumes the position or 90 days after the Opening Date, whichever occurs first. If we do not offer a place in general manager orientation within that time frame, your general manager must attend the next program held at which we offer a place. Any replacement general manager must complete general manager orientation within 90 days after he/she assumes the

6

position or the next program available, whichever comes later.  Your general manager for the Facility must complete general manager orientation even if you employ managers at other Chain Facilities who have already received this training. We charge you tuition of $1,100 for your first general manager if you open the Facility with our approval and your general manager completes general manager orientation within the time period established under this Agreement.  You must pay the tuition then in effect as disclosed in our latest Uniform Franchise Offering Circular ("UFOC"), but not more than $3,000, if you do not meet these deadlines.  For any supplemental or replacement general manager, you must pay the tuition in effect for the program when your manager attends the program.   You must also pay for your manager's travel, lodging, meals, incidental expenses, compensation and benefits.

4.1.2 **Owner Orientation Training.**   We will offer an owner orientation training program to familiarize you with the System, the Chain, and our services.   If this is your first System license, you (or a person with executive authority if you are an entity) must attend owner orientation preferably before, but not later than 90 days after the Opening Date. If we do not offer owner orientation training within this time period, you must attend the next program offered. Financial institutions and real estate mortgage investment conduits are exempt from the obligation to attend owner orientation, but may choose to do so at their option. Owner orientation will be no longer than five days.  We charge you tuition of $825 if you open the Facility with our approval and attend owner orientation within the time periods established under this Agreement.  If you do not open the Facility and attend orientation by such deadlines, you must pay the tuition then in effect for this program as disclosed in our latest UFOC, but not more than $3,000.  You must also pay your travel, lodging, meal and incidental expenses.

4.1.3 **On-Site Opening Training.** We will provide, and your staff must attend, on-site opening training (at our discretion as to length and scheduling) to assist you in opening the Facility. We currently do not charge tuition for this program.  You will pay the cost of any site used if the Facility is not available and the rent for any equipment we need.  You must provide lodging for our trainers at your expense. You must also pay, at our request, the reasonable travel, meal and out-of-pocket expenses incurred by our trainers for on-site opening training.

4.1.4 **Remedial Training.** We may require you, your general manager and/or your staff to participate in on-site remedial training if the Facility fails multiple quality assurance inspections and/or experiences significant complaints to our guest services department, as a condition to avoiding termination or to resumption of reservation service. You must pay the tuition in effect for this program when it is offered to you, and you must provide lodging for our trainers.  As of December 31, 2004, tuition for remedial on-site training is $450 per day, which must be paid before the training commences.  We may increase the tuition charge in the future.  The length of the remedial training could be up to five days, depending on the severity of the quality assurance and/or customer service issues.

4.1.5 **Supplemental Training.** We may offer other mandatory or optional training programs for reasonable tuition or without charge.  This training could be held in our U.S. training center or other locations.   You will pay for your representative's travel, lodging, meals, incidental expenses, compensation and benefits and any tuition charge we establish for this training.  This training may be held in conjunction with a Chain Lodging conference.  We may offer, rent or sell to you video tapes, computer discs or other on-site training aids and materials, or require you to buy them at reasonable prices. We may also offer Internet-based training via the Chain's intranet website.

7

**4.1.6 Cancellation Fees.** We will charge you a cancellation fee of 100% of the tuition for a program if you cancel your participation less than 15 days before it is scheduled to be held or if you fail to attend a training program as scheduled without notifying us in advance. This fee is non-refundable and you will also be charged the full tuition in effect for the program when you reschedule your training.

**4.2 Reservation System.** We will operate and maintain (directly or by subcontracting with an affiliate or one or more third parties) a computerized Reservation System or such technological substitute(s) as we determine, in our discretion. We will use the Room Sales Charge for the acquisition, development, support, equipping, maintenance, improvement and operation of the Reservation System. We will provide software maintenance for the software we license to you to connect to the Reservation System if you are up to date in your payment of Recurring Fees and all other fees you must pay under any other agreement with us or our affiliate. The Facility will participate in the Reservation System, commencing with the Opening Date for the balance of the Term. We have the right to provide reservation services to lodging facilities other than Chain Facilities or to other parties. We may use Room Sales Charges we collect to reimburse our reasonable direct and indirect costs, overhead or other expenses of operating the Reservation System.

**4.3 Marketing.**

4.3.1 We will promote public awareness and usage of Chain Facilities by implementing advertising, promotion, publicity, market research and other marketing programs, training programs and related activities, and the production and distribution of Chain publications and directories of hotels. We will determine in our discretion, after consultation with and the approval of the INOC Board of Directors: (i) The nature and type of media placement; (ii) The allocation (if any) among international, national, regional and local markets; and (iii) The nature and type of advertising copy, other materials and programs. We or an affiliate may be reimbursed from Marketing Contributions for the reasonable direct and indirect costs, overhead or other expenses of providing marketing services. We are not obligated to supplement or advance funds available from System licensees to pay for marketing activities. We do not promise that the Facility or you will benefit directly or proportionately from marketing activities.

4.3.2 We may, at our discretion, implement special international, national, regional or local promotional programs (which may or may not include the Facility) and may make available to you (to use at your option) media advertising copy and other marketing materials for prices which reasonably cover the materials' direct and indirect costs. We may require your participation in marketing programs approved by the INOC Board of Directors, and administer those programs on behalf of the INOC.

4.3.3 We will publish the Chain Directory. We will include the Facility in the Chain Directory after it opens if you submit the information we request on time, and you are not in default under this Agreement at the time we must arrange for publication. We will supply Directories to you for display at locations specified in the System Standards Manual or policy statements. We may assess you a reasonable charge for the direct and indirect expenses (including overhead) of producing and delivering the Directories.

HJEXCI
179820.3 Q2/05

4.3.4 We may use Marketing Contributions we collect to reimburse our reasonable direct and indirect costs, overhead and other expenses of providing marketing, training and related services.

4.4 **Purchasing.** We may offer optional assistance to you with purchasing items used at or in the Facility. Our affiliates may offer this service on our behalf. We may restrict the vendors authorized to sell proprietary or Mark-bearing items in order to control quality, provide for consistent service or obtain volume discounts. We will maintain and provide to you lists of suppliers approved to furnish Mark-bearing items, or whose products conform to System Standards.

4.5 **The System.** We will control and establish requirements for all aspects of the System. We may, in our discretion, change, delete from or add to the System, including any of the Marks or System Standards, in response to changing market conditions. We may, in our discretion, permit deviations from System Standards, based on local conditions and our assessment of the circumstances. We may change the designation standards for the Chain and then require that you change the designation of the Facility and related presentation of that designation wherever it appears.

4.6 **Consultations and Standards Compliance.** We will assist you to understand your obligations under System Standards by telephone, mail, during quality assurance inspections, through the System Standards Manual, at training sessions and during conferences and meetings we conduct. We will provide telephone and mail consultation on Facility operation and marketing through our representatives. We will offer you access to any Internet website we may maintain to provide Chain licensees with information and services, subject to any rules, policies and procedures we establish for its use and access and to this Agreement. We may limit or deny access to any such website while you are in default under this Agreement.

4.7 **System Standards Manual and Other Publications.** We will specify System Standards in the System Standards Manual, policy statements or other publications. We will lend you one copy of the System Standards Manual promptly after we sign this Agreement. We will send you any System Standards Manual revisions and/or supplements as and when issued. We will send you all other publications for Chain licensees and all separate policy statements in effect from time to time.

4.8 **Inspections and Audits.** We have the unlimited right to conduct unannounced quality assurance inspections of the Facility and its operations, records and Mark usage to test the Facility's compliance with System Standards and this Agreement, and the audits described in Section 3.8. We have the unlimited right to reinspect if the Facility does not achieve the score required on an inspection. We may impose a reinspection fee and will charge you for our costs as provided in Section 3.9. You will pay us an Audit Fee" of $300.00 when we invoice you for an Audit Fee under Section 3.8. We may increase the Audit Fee on a Chain-wide basis to cover any increases in our audit costs to not more than $500.00, effective any time after December 31, 2005. Our inspections are solely for the purposes of checking compliance with System Standards.

5. **Term.** The Term begins on the Effective Date and expires at the end of the twentieth License Year. Some of your duties and obligations will survive termination or expiration of this Agreement. NEITHER PARTY HAS RENEWAL RIGHTS OR OPTIONS.

HJEXC1
179820.3 Q2/05

**6. Application and Initial Fees.** We should receive from you a non-refundable Application Fee of $1,000.00. You will pay us a non-refundable Initial Fee in the amount of **$10,000.00**, which shall be due and payable in two installments. The first installment of $2,500.00 will be due when you sign this Agreement. The second installment of $7,500.00 will be due on or before December 13, 2005 as evidenced by delivery of a promissory note attached hereto.

**7. Recurring Fees, Taxes and Interest.**

7.1     You will pay us certain "Recurring Fees" in U.S. dollars (or such other currency as we may direct if the Facility is outside the United States) ten days after the month in which they accrue, without billing or demand. Recurring Fees are subject to Section 18 and include the following:

7.1.1   A "Royalty" equal to four percent (4.0%) of Gross Room Revenues of the Facility accruing during the calendar month, accrues from the earlier of the Opening Date or the date you identify the Facility as a Chain Facility or operate it under a Mark until the end of the Term.

7.1.2   A "Marketing Contribution" as set forth in Schedule C for advertising, promotion, training and other related services and programs, accrues from the Opening Date until the end of the Term. We may increase or adjust the Marketing Contribution or establish other marketing charges from time to time if either approved by the Board of Directors of the INOC or a successor sanctioned as such by us or approved by a majority vote (which shall be counted on the basis of one Chain Facility, one vote) of INOC members in good standing, present and voting at a general membership meeting or at a special meeting called for the purpose of considering the change in the Contribution by the INOC Board of Directors and upon at least 15 days' notice from us.

7.1.3   A "Room Sales Charge" as set forth in Schedule C as well as such other Reservation System Charges as we establish from time to time, accrues from the Opening Date until the end of the Term, including during suspension periods. We may increase or adjust such Room Sales Charge on a Chain-wide basis, upon 60 days written notice to Licensees, to cover costs (including reasonable direct or indirect overhead costs) related to such services and programs or the cost of additional services or programs. You will also pay or reimburse us for commissions we pay to travel and other agents for certain reservations at the Facility, for incentives we pay to other Chain Facilities or their employees for booking reservations at your Facility, and a "GDS Fee" levied to pay for reservations for the Facility originated or processed through the Global Distribution System, the Internet and other reservation systems and networks. We may charge a reasonable service fee for this service. We may charge Facilities using the Reservation System outside the United States for reservation service using a different formula.

7.2   You will pay to us "Taxes" equal to any federal, state or local sales, gross receipts, use, value added, excise or similar taxes assessed against us on the Recurring Fees by the jurisdictions where the Facility is located, but not including any income tax, franchise or other tax for our privilege of doing business in your State. You will pay Taxes to us when due.

7.3   **"Interest"** is payable when you receive our invoice on any past due amount payable to us under this Agreement at the rate of 1.5% per month or the maximum rate permitted by applicable law, whichever is less, accruing from the due date until the amount is paid.

10



7.4  If a **Transfer** occurs, your transferee or you will pay us our then current Application Fee and a "Relicense Fee" equal to the Initial Fee we would then charge a new licensee for the Facility.

## 8. Indemnifications.

8.1   Independent of your obligation to procure and maintain insurance, you will indemnify, defend and hold the Indemnitees harmless, to the fullest extent permitted by law, from and against all Losses and Expenses, incurred by any Indemnitee for any investigation, claim, action, suit, demand, administrative or alternative dispute resolution proceeding, relating to or arising out of any transaction, occurrence or service at, or involving the operation of, the Facility, any payment you make or fail to make to us, any breach or violation of any contract or any law, regulation or ruling by, or any act, error or omission (active or passive) of, you, any party associated or affiliated with you or any of the owners, officers, directors, employees, agents or contractors of you or your affiliates, including when you are alleged or held to be the actual, apparent or ostensible agent of the Indemnitee, or the active or passive negligence of any Indemnitee is alleged or proven.   You have no obligation to indemnify an Indemnitee for damages to compensate for property damage or personal injury if a court of competent jurisdiction makes a final decision not subject to further appeal that the Indemnitee engaged in willful misconduct or intentionally caused such property damage or bodily injury.   This exclusion from the obligation to indemnify shall not, however, apply if the property damage or bodily injury resulted from the use of reasonable force by the Indemnitee to protect persons or property.

8.2   You will respond promptly to any matter described in the preceding paragraph, and defend the Indemnitee.   You will reimburse the Indemnitee for all costs of defending the matter, including reasonable attorneys' fees, incurred by the Indemnitee if your insurer or you do not assume defense of the Indemnitee promptly when requested, or separate counsel is appropriate, in our discretion, because of actual or potential conflicts of interest.   We must approve any resolution or course of action in a matter that could directly or indirectly have any adverse effect on us or the Chain, or could serve as a precedent for other matters.

8.3   We will indemnify, defend and hold you harmless, to the fullest extent permitted by law, from and against all Losses and Expenses incurred by you in any action or claim arising from your proper use of the System alleging that your use of the System and any property we license to you is an infringement of a third party's rights to any trade secret, patent, copyright, trademark, service mark or trade name.   You will promptly notify us in writing when you become aware of any alleged infringement or an action is filed against you.   You will cooperate with our defense and resolution of the claim.   We may resolve the matter by obtaining a license of the property for you at our expense, or by requiring that you discontinue using the infringing property or modify your use to avoid infringing the rights of others.

## 9. Your Assignments, Transfers and Conveyances.

9.1   **Transfer of the Facility.**  This Agreement is personal to you (and your owners if you are an entity).   We are relying on your experience, skill and financial resources (and that of your owners and the guarantors, if any) to sign this Agreement with you.   You may finance the Facility and grant a lien, security interest or encumbrance on it without notice to us or our consent.   If a Transfer is to occur, the transferee or you must comply with Section 9.3.   Your License is subject

to termination when the Transfer occurs. The License is not transferable to your transferee, who has no right or authorization to use the System and the Marks when you transfer ownership or possession of the Facility. The transferee may not operate the Facility under the System, and you are responsible for performing the post-termination obligations in Section 13. You and your owners may, only with our prior written consent and after you comply with Sections 9.3 and 9.6, assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise. Transactions involving Equity Interests that are not Equity Transfers do not require our consent and are not Transfers.

9.2  **Public Offerings and Registered Securities.** You may engage in the first registered public offering of your Equity Interests only after you pay us a public offering fee equal to $15,000. Your Equity Interests (or those of a person, parent, subsidiary, sibling or affiliate entity, directly or indirectly effectively controlling you), are freely transferable without the application of this Section if they are, on the Effective Date, or after the public offering fee is paid, they become, registered under the federal Securities Act of 1933, as amended, or a class of securities registered under the Securities Exchange Act of 1934, as amended, or listed for trading on a national securities exchange or the automated quotation system of the National Association of Securities Dealers, Inc. (or any successor system), provided that any tender offer for at least a majority of your Equity Interests will be an Equity Transfer subject to Section 9.1.

9.3  **Conditions.** We may, to the extent permitted by applicable law, condition and withhold our consent to a Transfer when required under this Section 9 until the transferee and you meet certain conditions. If a Transfer is to occur, the transferee (or you, if an Equity Transfer is involved) must first complete and submit our Application, qualify to be a licensee in our sole discretion, given the circumstances of the proposed Transfer, provide the same supporting documents as a new license applicant, pay the Application and Relicense Fees then in effect, sign the form of License Agreement we then offer in conversion transactions and agree to renovate the Facility as if it were an existing facility converting to the System, as we reasonably determine. We will provide a Punch List of improvements we will require after the transferee's Application is submitted to us. We may require structural changes to the Facility if it no longer meets System Standards for entering conversion facilities, or in the alternative, condition our approval of the Transfer on one or more of the following: limit the transferee's term to the balance of your Term, add a right to terminate without cause exercisable by either party after a period of time has elapsed, or allow you to terminate the License when you sell the Facility and pay us Liquidated Damages under Section 12.1 at the same rate as you would pay if the termination occurred before the Opening Date. Such payment would be due and payable when you transfer possession of the Facility. We must also receive general releases from you and each of your owners, and payment of all amounts then owed to us and our affiliates by you, your owners, your affiliates, the transferee, its owners and affiliates, under this Agreement or otherwise. Our consent to the transaction will not be effective until these conditions are satisfied.

9.4  **Permitted Transferee Transactions.** You may transfer an Equity Interest or effect an Equity Transfer to a Permitted Transferee without obtaining our consent, renovating the Facility or paying a Relicense Fee or Application Fee. No Transfer will be deemed to occur. You also must not be in default and you must comply with the application and notice procedures specified in Sections 9.3 and 9.6. Each Permitted Transferee must first agree in writing to be bound by this Agreement, or at our option, execute the License Agreement form then offered prospective licensees. No transfer to a Permitted Transferee shall release a living transferor from liability

12

under this Agreement or any guarantor under any Guaranty of this Agreement. You must comply with this Section if you transfer the Facility to a Permitted Transferee. A transfer resulting from a death may occur even if you are in default under this Agreement.

9.5 **Attempted Transfers.** Any transaction requiring our consent under this Section 9 in which our consent is not first obtained shall be void, as between you and us. You will continue to be liable for payment and performance of your obligations under this Agreement until we terminate this Agreement, all your financial obligations to us are paid and all System identification is removed from the Facility.

9.6 **Notice of Transfers.** You will give us at least 30 days prior written notice of any proposed Transfer or Permitted Transferee transaction. You will notify us when you sign a contract to Transfer the Facility and 10 days before you intend to close on the transfer of the Facility. We will respond to all requests for our consent and notices of Permitted Transferee transactions within a reasonable time not to exceed 30 days. You will notify us in writing within 30 days after a change in ownership of 25% or more of your Equity Interests that are not publicly held or that is not an Equity Transfer, or a change in the ownership of the Facility if you are not its owner. You will provide us with lists of the names, addresses, and ownership percentages of your owner(s) at our request.

**10. Our Assignments.** We may assign, delegate or subcontract all or any part of our rights and duties under this Agreement, including by operation of law, without notice and without your consent. We will have no obligations to you after you are notified that our transferee has assumed our obligations under this Agreement except those that arose before we assign this Agreement.

**11. Default and Termination.**

11.1 **Default.** In addition to the matters identified in Sections 3.1 and 3.8, you will be in default under this Agreement if (a) you do not pay us when a payment is due under this Agreement or any other instrument, debt, agreement or account with us related to the Facility, (b) you do not perform any of your other obligations when this Agreement and the System Standards Manual require, or (c) if you otherwise breach this Agreement. If your default is not cured within ten days after you receive written notice from us that you have not filed your monthly report, paid us any amount that is due or breached your obligations regarding Confidential Information, or within 30 days after you receive written notice from us of any other default (except as noted below), then we may terminate this Agreement by written notice to you under Section 11.2. We will not exercise our right to terminate if you have completely cured your default, or until any waiting period required by law has elapsed. In the case of default resulting from the Facility's failure to meet Quality Standards as measured by a quality assurance inspection, you must act diligently to cure the default and resolve health, safety, cleanliness and housekeeping failures identified in the inspection report within 30 days after the failing inspection. Within 90 days after the failing inspection, you must also cure the remaining items identified in the inspection report and renovate and improve the Facility to meet our then current System Standards for entering conversion properties (or other standards specified under System Standards if we are not then accepting conversions) to cure the default. At your request, we will determine and provide a written improvement plan to assist your efforts to cure the default.

HJEXC1
179820.3 Q2/05

11.2 **Termination.** We may terminate the License, or this Agreement if the Opening Date has not occurred, effective when we send written notice to you or such later date as required by law or as stated in the default notice, when (1) you do not cure a default as provided in Section 11.1 or we are authorized to terminate under Section 3.1, (2) you discontinue operating the Facility as a "Howard Johnson", (3) you do or perform, directly or indirectly, any act or failure to act that in our reasonable judgment is or could be injurious or prejudicial to the goodwill associated with the Marks or the System, (4) you lose possession or the right to possession of the Facility, (5) you (or any guarantor) suffer the termination of another license or License Agreement with us or one of our affiliates, (6) you intentionally maintain false books and records or submit a materially false report to us, (7) you (or any guarantor) generally fail to pay debts as they come due in the ordinary course of business, (8) you, any guarantor or any of your owners or agents misstated to us or omitted to tell us a material fact to obtain or maintain this Agreement with us, (9) you receive two or more notices of default from us in any one year period (whether or not you cure the defaults), (10) a violation of Section 9 occurs, or a Transfer occurs before the relicensing process is completed, (11) you or any of your Equity Interest owners contest in court the ownership or right to franchise or license all or any part of the System or the validity of any of the Marks, (12) you, any guarantor or the Facility is subject to any voluntary or involuntary bankruptcy, liquidation, dissolution, receivership, assignment, reorganization, moratorium, composition or a similar action or proceeding that is not dismissed within 60 days after its filing, or (13) you maintain or operate the Facility in a manner that endangers the health or safety of the Facility's guests.

11.3 **Casualty and Condemnation.**

11.3.1 You will notify us promptly after the Facility suffers a Casualty that prevents you from operating in the normal course of business, with less than 75% of guest rooms available. You will give us information on the availability of guest rooms and the Facility's ability to honor advance reservations. You will tell us in writing within 60 days after the Casualty whether or not you will restore, rebuild and refurbish the Facility to conform to System Standards and its condition prior to the Casualty. This restoration will be completed within 180 days after the Casualty. You may decide within the 60 days after the Casualty, and if we do not hear from you, we will assume that you have decided, to terminate this Agreement, effective as of the date of your notice or 60 days after the Casualty, whichever comes first. If this Agreement so terminates, you will pay all amounts accrued prior to termination and follow the post-termination requirements in Section 13. You will not be obligated to pay Liquidated Damages if the Facility will no longer be used as an extended stay or transient lodging facility after the Casualty.

11.3.2 You will notify us in writing within 10 days after you receive notice of any proposed Condemnation of the Facility, and within 10 days after receiving notice of the Condemnation date. This Agreement will terminate on the date the Facility or a substantial portion is conveyed to or taken over by the condemning authority.

11.4 **Our Other Remedies.** We may suspend the Facility from the Reservation System for any default or failure to pay or perform under this Agreement or any other written agreement with us relating to the Facility, discontinue Reservation System referrals to the Facility for the duration of such suspension, and may divert previously made reservations to other Chain Facilities after giving notice of non-performance, non-payment or default. All Room Sales Charges accrue during the suspension period. We may deduct points under our quality assurance inspection

14

program for your failure to comply with this Agreement or System Standards. Reservation service will be restored after you have fully cured any and all defaults and failures to pay and perform. We may charge you, and you must pay as a condition precedent to restoration of reservation service, a Service Interruption Fee specified on Schedule C to reimburse us for our costs associated with service suspension and restoration. We may omit the Facility from the Directory if you are in default on the date we must determine which Chain Facilities are included in the Directory. You recognize that any use of the System not in accord with this Agreement will cause us irreparable harm for which there is no adequate remedy at law, entitling us to injunctive and other relief. We may litigate to collect amounts due under this Agreement without first issuing a default or termination notice. Our consent or approval may be withheld if needed while you are in default under this Agreement or may be conditioned on the cure of all your defaults.

11.5 **Your Remedies.** If we fail to issue our approval or consent as and when required under this Agreement within a reasonable time of not less than 30 days after we receive all of the information we request, and you believe our refusal to approve or consent is wrongful, you may bring a legal action against us to compel us to issue our approval or consent to the obligation. To the extent permitted by applicable law, this action shall be your exclusive remedy. We shall not be responsible for direct, indirect, special, consequential or exemplary damages, including, but not limited to, lost profits or revenues.

## 12. Liquidated Damages.

12.1 **Generally.** If we terminate the License under Section 11.2, or you terminate this Agreement (except under Section 11.3 or as a result of our default which we do not cure within a reasonable time after written notice), you will pay us within 30 days following the date of termination, as Liquidated Damages, an amount equal to the sum of accrued Royalties, Marketing Contributions and Room Sales Charges during the immediately preceding 24 full calendar months (or the number of months remaining in the unexpired Term (the "Ending Period") at the date of termination, whichever is less). If the Facility has been open for fewer than 24 months, then the amount shall be the average monthly Royalties, Marketing Contributions and Room Sales Charges since the Opening Date multiplied by 24. You will also pay any applicable Taxes assessed on such payment and Interest calculated under Section 7.3 accruing from 30 days after the date of termination. Before the Ending Period, Liquidated Damages will not be less than the product of $2,000 multiplied by the number of guest rooms you are then authorized to operate under Schedule B of this Agreement, as amended. If we terminate this Agreement under Section 3 before the Opening Date, you will pay us within 10 days after you receive our notice of termination Liquidated Damages equal to one-half the amount payable for termination under Section 11.2. Liquidated Damages are paid in place of our claims for lost future Recurring Fees under this Agreement. Our right to receive other amounts due under this Agreement is not affected.

12.2 **Condemnation Payments.** In the event a Condemnation is to occur, you will pay us the fees set forth in Section 7 for a period of one year after we receive the initial notice of condemnation described in Section 11.3.2, or until the Condemnation occurs, whichever is longer. You will pay us Liquidated Damages equal to the average daily Recurring Fees for the one year period preceding the date of your condemnation notice to us multiplied by the number of days remaining in the one year notice period if the Condemnation is completed before the one

15

year notice period expires. This payment will be made within 30 days after Condemnation is completed (when you close the Facility or you deliver it to the condemning authority). If the Condemnation is completed after the one year notice period expires you will pay no Liquidated Damages, but the fees set forth in Section 7 must be paid when due until Condemnation is completed.

**13.   Your Duties At and After Termination.**  When the License or this Agreement terminates for any reason whatsoever:

13.1  **System Usage Ceases.**   You will immediately stop using the System to operate and identify the Facility.  You will remove all signage and other items bearing any Marks and follow the other steps detailed in the System Standards Manual for changing the identification of the Facility.  You will promptly paint over or remove the Facility's distinctive System trade dress, color schemes and architectural features.  You shall not identify the Facility with a confusingly similar mark or name, or use the same colors as the System trade dress for signage, printed materials and painted surfaces. You will cease all Internet marketing using any Marks to identify the Facility.

13.2  **Other Duties.**  You will pay all amounts owed to us under this Agreement within 10 days after termination.  You will owe us Recurring Fees on Gross Room Revenues accruing while the Facility is identified as a "Howard Johnson", including Room Sales Charges for so long as the Facility receives service from the Reservation System.  We may immediately remove the Facility from the Reservation System and divert reservations as authorized in Section 11.4.  We may notify third parties that the Facility is no longer associated with the Chain.  We may also, to the extent permitted by applicable law, and without prior notice enter the Facility and any other parcels, remove software (including archive and back-up copies) for accessing the Reservation System, all copies of the System Standards Manual, Confidential Information, equipment and all other personal property of ours, and paint over or remove and purchase for $10.00, all or part of any interior or exterior Mark-bearing signage (or signage face plates), including billboards, whether or not located at the Facility, that you have not removed or obliterated within five days after termination.  You will promptly pay or reimburse us for our cost of removing such items, net of the $10.00 purchase price for signage.  We will exercise reasonable care in removing or painting over signage.  We will have no obligation or liability to restore the Facility to its condition prior to removing the signage.  We shall have the right, but not the obligation, to purchase some or all of the Facility's Mark-bearing FF&E and supplies at the lower of their cost or net book value, with the right to set off their aggregate purchase price against any sums then owed us by you.

13.3  **Advance Reservations.**  The Facility will honor any advance reservations, including group bookings, made for the Facility prior to termination at the rates and on the terms established when the reservations are made and pay when due all related travel agent commissions.

13.4  **Survival of Certain Provisions.**  Sections 3.8 (as to audits, for 2 years after termination), 3.13, 7 (as to amounts accruing through termination), 8, 11.4, 12, 13, 15, 16 and 17 survive termination of the License and this Agreement, whether termination is initiated by you or us, even if termination is wrongful.

16

**14.   Your Representations and Warranties.**   You expressly represent and warrant to us as follows:

**14.1   Quiet Enjoyment and Financing.**   You own, or will own prior to commencing improvement, or lease, the Location and the Facility.   You will be entitled to possession of the Location and the Facility during the entire Term without restrictions that would interfere with your performance under this Agreement, subject to the reasonable requirements of any financing secured by the Facility.   You have, when you sign this Agreement, and will maintain during the Term, adequate financial liquidity and financial resources to perform your obligations under this Agreement.

**14.2   This Transaction.**   You and the persons signing this Agreement for you have full power and authority and have been duly authorized, to enter into and perform or cause performance of your obligations under this Agreement.   You have obtained all necessary approvals of your owners, Board of Directors and lenders.   No executory franchise, license, or affiliation agreement for the Facility exists other than this Agreement.   Your execution, delivery and performance of this Agreement will not violate, create a default under or breach of any charter, bylaws, agreement or other contract, license, permit, indebtedness, certificate, order, decree or security instrument to which you or any of your principal owners is a party or is subject or to which the Facility is subject.   Neither you nor the Facility is the subject of any current or pending merger, sale, dissolution, receivership, bankruptcy, foreclosure, reorganization, insolvency, or similar action or proceeding on the date you execute this Agreement and was not within the three years preceding such date, except as disclosed in the Application.   You will submit to us the documents about the Facility, you, your owners and your finances that we request in the License Application (or after our review of your initial submissions) before or within 30 days after you sign this Agreement.   To the best of your knowledge, neither you, your owners (if you are an entity), your officers, directors or employees or anyone else affiliated or associated with you, whether by common ownership, by contract, or otherwise, has been designated as, or is, a terrorist, a "Specially Designated National" or a "Blocked Person" under U.S. Executive Order 13224, in lists published by the U.S. Department of the Treasury's Office of Foreign Assets Control, or otherwise.

**14.3   No Misrepresentations or Implied Covenants.**   All written information you submit to us about the Facility, you, your owners, any guarantor, or the finances of any such person or entity, was or will be at the time delivered and when you sign this Agreement, true, accurate and complete, and such information contains no misrepresentation of a material fact, and does not omit any material fact necessary to make the information disclosed not misleading under the circumstances. There are no express or implied covenants or warranties, oral or written, between we and you except as expressly stated in this Agreement.

**15.   Proprietary Rights.**

**15.1   Marks and System.**   You will not acquire any interest in or right to use the System or Marks except under this Agreement.   You will not apply for governmental registration of the Marks, or use the Marks or our corporate name in your legal name, but you may use a Mark for an assumed business or trade name filing.

15.2   **Inurements.**  All present and future distinguishing characteristics, improvements and additions to or associated with the System by us, you or others, and all present and future service marks, trademarks, copyrights, service mark and trademark registrations used and to be used as part of the System, and the associated good will, shall be our property and will inure to our benefit.  No good will shall attach to any secondary designator that you use.

15.3   **Other Locations and Systems.**  We and our affiliates each reserve the right to own, in whole or in part, and manage, operate, use, lease, finance, sublease, franchise, license (as licensor or licensee), provide services to or joint venture (i) distinctive separate lodging or food and beverage marks and other intellectual property which are not part of the System, and to enter into separate agreements with you or others (for separate charges) for use of any such other marks or proprietary rights, (ii) other lodging, food and beverage facilities, or businesses, under the System utilizing modified System Standards, and (iii) a Chain Facility at or for any location outside the Protected Territory described in Section 17.8.   You acknowledge that we are affiliated with or in the future may become affiliated with other lodging providers or franchise systems that operate under names or marks other than the Marks.  We and our affiliates may use or benefit from common hardware, software, communications equipment and services and administrative systems for reservations, franchise application procedures or committees, marketing and advertising programs, personnel, central purchasing, approved supplier lists, franchise sales personnel (or independent franchise sales representatives), etc.

15.4   **Confidential Information.**   You will take all appropriate actions to preserve the confidentiality of all Confidential Information.  Access to Confidential Information should be limited to persons who need the Confidential Information to perform their jobs and are subject to your general policy on maintaining confidentiality as a condition of employment or who have first signed a confidentiality agreement.   You will not permit copying of Confidential Information (including, as to computer software, any translation, decompiling, decoding, modification or other alteration of the source code of such software).  You will use Confidential Information only for the Facility and to perform under this Agreement.  Upon termination (or earlier, as we may request), you shall return to us all originals and copies of the System Standards Manual, policy statements and Confidential Information "fixed in any tangible medium of expression," within the meaning of the U.S. Copyright Act, as amended.   Your obligations under this subsection commence when you sign this Agreement and continue for trade secrets (including computer software we license to you) as long as they remain secret and for other Confidential Information, for as long as we continue to use the information in confidence, even if edited or revised, plus three years.  We will respond promptly and in good faith to your inquiry about continued protection of any Confidential Information.

15.5   **Litigation.**  You will promptly notify us of (i) any adverse or infringing uses of the Marks (or names or symbols confusingly similar), Confidential Information or other System intellectual property, and (ii) any threatened or pending litigation related to the System against (or naming as a party) you or us of which you become aware.  We alone handle disputes with third parties concerning use of all or any part of the System.  You will cooperate with our efforts to resolve these disputes.  We need not initiate suit against imitators or infringers who do not have a material adverse impact on the Facility, or any other suit or proceeding to enforce or protect the System in a matter we do not believe to be material.

18

**15.6  The Internet.**  You may use the Internet to market the Facility subject to this Agreement and System Standards.  You shall not use, license or register any domain name, universal resource locator, or other means of identifying you or the Facility that uses a mark or any image or language confusingly similar to a Mark without our consent.  You will assign to us any such identification at our request without compensation or consideration.  You must make available through the Reservation System and the Chain website all rates you offer to the general public via Internet marketing arrangements with third parties.  You must participate in the Chain's best available rate on the Internet guarantee or successor program.  The content you provide us or use yourself for any Internet marketing must be true, correct and accurate, and you will notify us in writing promptly when any correction to the content becomes necessary.  You shall promptly modify at our request the content of any Internet marketing material for the Facility you use, authorize, display or provide to conform to System Standards.  Any use of the Marks and other elements of the System on the Internet inures to our benefit under Section 15.2.

## 16.  Relationship of Parties.

**16.1  Independence.**  You are an independent contractor.  You are not our legal representative or agent, and you have no power to obligate us for any purpose whatsoever.  We and you have a business relationship based entirely on and circumscribed by this Agreement.  No partnership, joint venture, agency, fiduciary or employment relationship is intended or created by reason of this Agreement.  You will exercise full and complete control over and have full responsibility for your contracts, daily operations, labor relations, employment practices and policies, including, but not limited to, the recruitment, selection, hiring, disciplining, firing, compensation, work rules and schedules of your employees.

**16.2  Joint Status.**  If you comprise two or more persons or entities (notwithstanding any agreement, arrangement or understanding between or among such persons or entities) the rights, privileges and benefits of this Agreement may only be exercised and enjoyed jointly.  The liabilities and responsibilities under this Agreement will be the joint and several obligations of all such persons or entities.

## 17.  Legal Matters.

**17.1  Partial Invalidity.**  If all or any part of a provision of this Agreement violates the law of your state (if it applies), such provision or part will not be given effect.  If all or any part of a provision of this Agreement is declared invalid or unenforceable, for any reason, or is not given effect by reason of the prior sentence, the remainder of the Agreement shall not be affected.  However, if in our judgment the invalidity or ineffectiveness of such provision or part substantially impairs the value of this Agreement to us, then we may at any time terminate this Agreement by written notice to you without penalty or compensation owed by either party.

**17.2  Waivers, Modifications and Approvals.**  If we allow you to deviate from this Agreement, we may insist on strict compliance at any time after written notice.  Our silence or inaction will not be or establish a waiver, consent, course of dealing, implied modification or estoppel.  All modifications, waivers, approvals and consents of or under this Agreement by us must be in writing and signed by our authorized representative to be effective.  We may unilaterally revise Schedule C when this Agreement so permits.

HJEXC1
179820.3  Q2/05

17.3 **Notices.** Notices will be effective if in writing and delivered (i) by facsimile transmission with confirmation original sent by first class mail, postage prepaid, (ii) by delivery service, with proof of delivery, or (iii) by first class, prepaid certified or registered mail, return receipt requested, to the appropriate party (x) at its address stated below or as it may otherwise designate by notice, or (y) by such other means as to result in actual or constructive receipt by the person or office holder designated below. The parties may also communicate via electronic mail between addresses to be established by notice. You consent to receive electronic mail from us. Notices shall be deemed given on the date delivered or date of attempted delivery, if refused.

Howard Johnson International, Inc.:
Our address: 1 Sylvan Way, P.O. Box 278, Parsippany, New Jersey 07054-0278
Attention: Vice President-Franchise Administration;
Fax No. (973) 496-5359

Your name: **Seven Hills Hospitality Group LLC,**
Your address: **530 EAB Plaza, Uniondale, NY 11556,**
Attention: **Gaurang Parikh;**
Your fax No.: **(516) 794-6014.**

17.4 **Remedies.** Remedies specified in this Agreement are cumulative and do not exclude any remedies available at law or in equity. The non-prevailing party will pay all costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party to enforce this Agreement or collect amounts owed under this Agreement.

17.5 **Miscellaneous.** This Agreement is exclusively for the benefit of the parties. There are no third party beneficiaries. No agreement between us and anyone else is for your benefit. The section headings in this Agreement are for convenience of reference only.

17.6 **Choice of Law; Venue; Dispute Resolution.**

17.6.1 This Agreement will be governed by and construed under the laws of the State of New Jersey, except for its conflicts of law principles. The New Jersey Franchise Practices Act will not apply to any Facility located outside the State of New Jersey.

17.6.2 The parties shall attempt in good faith to resolve any dispute concerning this Agreement or the parties' relationship promptly through negotiation between authorized representatives. If these efforts are not successful, either party may attempt to resolve the dispute through non-binding mediation. Either party may request mediation through the National Franchise Mediation Program, using the procedures employed by the CPR Institute for Dispute Resolution, Inc. We will provide you with the contact address for that organization. The mediation will be conducted by a mutually acceptable and neutral third party. If the parties cannot resolve the dispute through negotiation or mediation, or choose not to negotiate or mediate, either party may pursue litigation.

17.6.3 You consent and waive your objection to the non-exclusive personal jurisdiction of and venue in the New Jersey state courts situated in Morris County, New Jersey and the United States District Court for the District of New Jersey for all cases and controversies under this Agreement or between we and you.

20

**17.6.4  WAIVER OF JURY TRIAL.  THE PARTIES WAIVE THE RIGHT TO A JURY TRIAL IN ANY ACTION RELATED TO THIS AGREEMENT OR THE RELATIONSHIP BETWEEN THE LICENSOR, THE LICENSEE, ANY GUARANTOR, AND THEIR RESPECTIVE SUCCESSORS AND ASSIGNS.**

**17.7  Special Acknowledgments.  You acknowledge the following statements to be true and correct as of the date you sign this Agreement, and to be binding on you.**

**17.7.1  You received our Uniform Franchise Offering Circular ("UFOC") for prospective licensees at least 10 business days before, and a copy of this Agreement and all other agreements we are asking you to sign at least 5 business days before, signing this Agreement and paying the Initial Fee to us.  You have received our UFOC at least 10 business days before you paid any fee to us or signed any contract with us.**

**17.7.2  Neither we nor any person acting on our behalf has made any oral or written representation or promise to you on which you are relying to enter into this Agreement that is not written in this Agreement.  You release any claim against us or our agents based on any oral or written representation or promise not stated in this Agreement.**

**17.7.3  This Agreement, together with the exhibits and schedules attached, is the entire agreement superseding all previous oral and written representations, agreements and understandings of the parties about the Facility and the License.**

**17.7.4  You acknowledge that no salesperson has made any promise or provided any information to you about projected sales, revenues, income, profits or expenses from the Facility except as stated in Item 19 of the UFOC or in a writing that is attached to this Agreement.**

**17.7.5  You understand that the franchise relationship is an arms' length, commercial business relationship in which each party acts in its own interest.**

17.8  Protected Territory.  We will not own, operate, lease, manage, or license any party but you to operate a Chain Facility in the "Protected Territory", defined below, while this Agreement is in effect.  We may own, operate, lease, manage, franchise or license anyone to operate any Chain Facility located anywhere outside the Protected Territory without any restriction or obligation to you.  We may grant Protected Territories for other Chain Facilities that overlap your Protected Territory.  While this Agreement is in effect, neither you nor your officers, directors, general partners or owners of 25% or more of your Equity Interests, may own, operate, lease, manage or franchise any guest lodging facility other than the Facility in the Protected Territory unless we or our affiliate licenses the facility.  You will use any information obtained through the Reservation System to refer guests, directly or indirectly, only to Chain Facilities.  This Section does not apply to any Chain Facility located in the Protected Territory on the Effective Date, which we may renew, relicense, allow to expand, or replace with a replacement Facility located within the same trading area having not more than 120% of the guest rooms of the replaced Chain Facility if its license with us terminates or is not renewed.  The Protected Territory fairly represents the Facility's trading area, and you acknowledge that.  There are no express or implied territorial rights or agreements between the parties except as stated in this Section.  By electing to include

this section in your Agreement, you irrevocably waive any right to seek or obtain the benefits of any policy we now follow or may in the future follow to notify you about proposed Chain Facilities in the general area of the Facility, solicit information about the effect of the proposed Chain Facility on the revenue or occupancy of the Facility or decide whether to add the proposed Chain Facility to the Chain based on the potential effect of the proposed Chain Facility on the Facility or its performance. The covenants in this Section are mutually dependent; if you breach this Section, your Protected Territory will be the Location only. The Protected Territory means **all the area within a circle created by a one (1) mile radius whose centerpoint is 1300 Sedgwick Avenue, Bronx, NY (Latitude 40.84130 N and Longitude 73.92821 W).**

18. **Special Stipulations.** The following stipulations apply to this Agreement and supersede any conflicting provision.

18.1 **Combined Fees.** Notwithstanding Section 7 of this Agreement, you will pay "Combined Fees" each month, consisting of Royalties, the Marketing Contribution and Room Sales Charge, to us at the rates set forth in this section if the Opening Date occurs on or before the deadline established by this Agreement:

18.1.1 If the Opening Date occurs on the first day of a month, the Combined Fee for the first and second License Years shall be an amount equal to the lesser amount of $55.00 for each approved guest room per month or 6.5% of Gross Room Revenues. If the Opening Date occurs on a day other than the first day of a month, the Combined Fee shall be (i) 6.5% of Gross Room Revenues for the period beginning on the Opening Date and ending on the last day of the month in which the Opening Date occurs and (ii) the lesser amount of $55.00 for each approved guest room per month or 6.5% of Gross Room Revenues for the remainder of the first License Year and for the second License Year. ·

18.1.2 For the third, fourth and fifth License Years, the Combined Fee shall be an amount equal to (i) the lesser amount of $60.00 for each approved guest room or 7% of Gross Room Revenues for each of the first 11 months of that License Year, and (ii) the lesser amount of $65.00 for each approved guest room or 7% of Gross Room Revenues for the twelfth month of that License Year.

18.1.3 You will pay the Combined Fee at the fixed amount per month for each of the first five License Years. We will reconcile the Facility's Gross Room Revenues for each License Year within 45 days after you send in all of the monthly room revenue reports for the year. If you have overpaid the Combined Fee we will issue a credit to you to be applied to other fees and charges you owe under the License Agreement. You pay the Guest Loyalty Marketing Fee, transaction charges and the other fees and charges listed on Schedule C as and when due monthly throughout each License Year. You may change your payment election in the first sentence of this Subsection effective at the beginning of a new License Year by providing us with at least 30 days prior written notice. You may exercise this right only one time during the first five License Years.

18.1.4 You resume paying Royalties, the Marketing Contribution and Room Sales Charges at the rates set forth in Section 7 of this Agreement after the fifth License Year. You will resume paying Royalties, the Marketing Contribution and Room Sales Charges at the rates set forth in Section 7 at any time during the first five License Years if (i) you default under the License

22

Agreement and fail to cure the default within the time permitted under the License Agreement and the default notice, (ii) the average quality assurance inspection score of the Facility is more than 200 points (or equivalent score under a successor quality assurance scoring system we employ), on any two consecutive routine inspections after the opening inspection, or (iii) an audit we perform under Section 3.8 determines that you have reported less than 98% of the Gross Room Revenues of the Facility for the accounting periods audited or you are in default under this Agreement because one of the events described in Section 3.8.3 occurs.

18.2  **Special Conversion Fee.** This Section 18.2 applies after the third License Year only if the Opening Date occurs on or before the deadline established by this Agreement,. If you convert the Facility to affiliation with the Days Inn®, Ramada®, or Knights Inn® chains under a franchise or license agreement you sign before conversion, and the chain to which you convert the Facility is then owned by Cendant Corporation, then you will pay us no Liquidated Damages under this Agreement, and your initial fee with the new chain will be $10,000. If you convert the Facility to affiliation with the Travelodge® chain under a license agreement you sign before conversion, and this chain is then owned by Cendant Corporation, then you will pay us no Liquidated Damages under this Agreement, and you will not pay an initial fee under that Travelodge license agreement.

18.3  **Your Additional Termination Right.** If the Opening Date occurs on or before the deadline established by this Agreement, you may terminate the License without cause or penalty effective only on the seventh or twelfth anniversary of the Opening Date provided you give us at least six months prior written notice of termination and you are not in default under this Agreement at the time notice must be given or at the effective date of termination. You will pay no Liquidated Damages if you satisfy the conditions of the preceding sentence and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. Your rights under this Section will automatically terminate without notice if and as of the date (i) a Termination occurs, (ii) you fail to cure any default under this Agreement within the time permitted, if any, in the notice of default we send you, or (iii) after the Facility satisfies the Improvement Obligation, the Facility scores more than 200 points (or equivalent score under a successor quality assurance scoring system we employ) on a quality assurance inspection and then fails to achieve a score of 200 or fewer points (or equivalent score), in a re-inspection to be performed no sooner than 60 days after the initial inspection.

18.4  **Our Additional Termination Right.** We may terminate the License without cause or penalty effective only on the seventh or twelfth anniversary of the Opening Date provided we give you at least six months prior written notice of termination. You will perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. You will pay no Liquidated Damages if we terminate the License under this Section and you perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination.

18.5  **Your Test Period and Termination Right.** This Section 18.5 will apply if the Opening Date occurs on or before the deadline established by this Agreement. If and when the Facility achieves a quality assurance inspection score of no more than 200 points, a 30-month "Test Period" begins. During the Test Period, you must cause the Facility to maintain an average quality assurance inspection score of no more than 200 points (or equivalent score under a successor quality assurance scoring system we employ), participate in all marketing programs

23

designated as mandatory by the INOC Board of Directors and pay all Recurring Fees accruing during the Test Period when due. If you satisfy these conditions, and you are dissatisfied with your franchise for any reason, you may terminate the License without cause or penalty, and without payment of any Liquidated Damages, effective only on the first day of the 41st month after the start of the Test Period. You give us at least ten months advance written notice of termination. You must cure any pending monetary or insurance default under this Agreement at the time notice must be given and at the effective date of termination. You must perform the post termination obligations specified in this Agreement within 10 days after the effective date of termination. Your rights under this Section will automatically terminate without notice if and as of the date (i) you fail to complete the Punch List (if you convert rather than build the Facility) by the dates it specifies, or (ii) you fail to cure any default that is subject to cure rights under this Agreement within the time permitted in the notice of default we send you.

18.6  **Liquidated Damages.** If the Opening Date occurs on or before the deadline established by this Agreement, Liquidated Damages payable under Section 12.1 for a Termination that occurs will be an amount equal to lesser of the following: (i) the average monthly fees that accrued under Section 7.1 or Section 18.1, whichever applies, during the 24 full calendar months preceding the month (or the number of months since the Opening Date, whichever is less) in which Termination occurs, multiplied by 24; or (ii) the product of $1,000 multiplied by the number of guest rooms you are then authorized to operate under Schedule B of this Agreement, as amended.

18.7  **Reduced Relicense Fee.** If (i) you are not then in default under this Agreement, (ii) we receive your proposed transferee's Franchise Application and Application Fee before you Transfer the Facility, and (iii) we receive the Franchise Application before the end of the fifth License Year, then the Relicense Fee for a Transfer will be $5,000.00. If the conditions are not satisfied, and after the fifth License Year, the Relicense Fee will be as specified in Section 7.4.

**remainder of page intentionally left blank**

HJEXC1
179820.3 Q2/05



IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first stated above.

**WE:**
**HOWARD JOHNSON INTERNATIONAL, INC.**

By: _____     Attest: _____
      Vice President                                       Assistant Secretary

**YOU,** as licensee:
**SEVEN HILLS HOSPITALITY GROUP LLC**

By: _____     Witness _____
      (Managing) Member

25

## APPENDIX A

### DEFINITIONS

Agreement means this License Agreement.

Application Fee means the fee you pay when you submit your Application under Section 6.

Approved Plans means your plans and specifications for constructing or improving the Facility initially or after opening, as approved by us under Section 3.

Casualty means destruction or significant damage to the Facility by act of God or other event beyond your reasonable anticipation and control.

Chain means the network of Chain Facilities.

Chain Facility means a lodging facility we own, lease, manage, operate or authorize another party to operate using the System and identified by the Marks.

Condemnation means the taking of the Facility for public use by a government or public agency legally authorized to do so, permanently or temporarily, or the taking of such a substantial portion of the Facility that continued operation in accordance with the System Standards, or with adequate parking facilities, is commercially impractical, or if the Facility or a substantial portion is sold to the condemning authority in lieu of condemnation.

Conference Fee means the fee we charge for your attendance at a conference for Chain Facilities and their licensees when and if held.

Confidential Information means any trade secrets we own or protect and other proprietary information not generally known to the lodging industry including confidential portions of the System Standards Manual or information we otherwise impart to you and your representatives in confidence. Confidential Information includes the "Standards of Operation and Design Manual" and all other System Standards manuals and documentation, including those on the subjects of employee relations, finance and administration, field operation, purchasing and marketing, the Reservation System software and applications software.

Design Standards mean standards specified in the System Standards Manual from time to time for design, construction, renovation, modification and improvement of new or existing Chain Facilities, including all aspects of facility design, number of rooms, rooms mix and configuration, construction materials, workmanship, finishes, electrical, mechanical, structural, plumbing, HVAC, utilities, access, life safety, parking, systems, landscaping, amenities, interior design and decor and the like for a Chain Facility.

Directory means the general purpose directory we publish listing the names and addresses of Chain Facilities, and at our discretion, other Howard Johnson facilities located outside the United States, Canada and Mexico.

26

Effective Date means the date we insert in the Preamble of this Agreement after we sign it.

Equity Interests shall include, without limitation, all forms of equity ownership of you, including voting stock interests, partnership interests, limited liability company membership or ownership interests, joint and tenancy interests, the proprietorship interest, trust beneficiary interests and all options, warrants, and instruments convertible into such other equity interests.

Equity Transfer means any transaction in which your owners or you sell, assign, transfer, convey, pledge, or suffer or permit the transfer or assignment of, any percentage of your Equity Interests that will result in a change in control of you to persons other than those disclosed on Schedule B, as in effect prior to the transaction. Unless there are contractual modifications to your owners' rights, an Equity Transfer of a corporation or limited liability company occurs when either majority voting rights or beneficial ownership of more than 50% of the Equity Interests changes. An Equity Transfer of a partnership occurs when a newly admitted partner will be the managing, sole or controlling general partner, directly or indirectly through a change in control of the Equity Interests of an entity general partner. An Equity Transfer of a trust occurs when either a new trustee with sole investment power is substituted for an existing trustee, or a majority of the beneficiaries convey their beneficial interests to persons other than the beneficiaries existing on the Effective Date. An Equity Transfer does not occur when the Equity Interest ownership among the owners of Equity Interests on the Effective Date changes without the admission of new Equity Interest owners. An Equity Transfer occurs when you merge, consolidate or issue additional Equity Interests in a transaction which would have the effect of diluting the voting rights or beneficial ownership of your owners' combined Equity Interests in the surviving entity to less than a majority.

Facility means the Location, together with all improvements, buildings, common areas, structures, appurtenances, facilities, entry/exit rights, parking, amenities, FF&E and related rights, privileges and properties to be constructed at the Location after the Effective Date.

FF&E means furniture, fixtures and equipment.

FF&E Standards means standards specified in the System Standards Manual for FF&E and supplies to be utilized in a Chain Facility.

Food and Beverage means any restaurant, catering, bar/lounge, entertainment, room service, retail food or beverage operation, continental breakfast, food or beverage concessions and similar services offered at the Facility.

Gross Room Revenues means gross revenues attributable to or payable for rentals of guest rooms at the Facility, including all credit transactions, whether or not collected, but excluding separate charges to guests for Food and Beverage, room service, telephone charges, key forfeitures and entertainment; vending machine receipts; and federal, state and local sales, occupancy and use taxes.

27

<u>Improvement Obligation</u> means your obligation to either (i) renovate and upgrade the Facility, or (ii) construct and complete the Facility, in accordance with the Approved Plans and System Standards, as described in Section 3.

<u>Indemnitees</u> means us, our direct and indirect parent, subsidiary and sister corporations, and the respective officers, directors, shareholders, employees, agents and contractors, and the successors, assigns, personal representatives, heirs and legatees of all such persons or entities.

<u>Initial Fee</u> means the fee you are to pay for signing this Agreement as stated in Section 6.

<u>INOC</u> means the International Operators' Council, Inc., a Georgia non-profit corporation, its successors and assigns as the official organization of Chain licensees.

<u>License</u> means the non-exclusive license to operate the type of Chain Facility described in Schedule B only at the Location, using the System and the Mark we designate in Section 1.

<u>License Year</u> means:

(i) *If the Opening Date occurs on the first day of a month*: the period beginning on the Opening Date and ending on the day immediately preceding the first anniversary of the Opening Date, and each subsequent one year period; or

(ii) *If the Opening Date does not occur on the first day of a month:* the period beginning on the Opening Date and ending on the first anniversary of the last day of the month in which the Opening Date occurs, and each subsequent one year period.

<u>Liquidated Damages</u> means the amounts payable under Section 12, set by the parties because actual damages will be difficult or impossible to ascertain on the Effective Date and the amount is a reasonable pre-estimate of the damages that will be incurred and is not a penalty.

<u>Location</u> means the parcel of land situated at **1300 Sedgwick Avenue, Bronx, NY 10452**, as more fully described in Schedule A.

<u>Losses and Expenses</u> means (x) all payments or obligations to make payments either (i) to or for third party claimants by any and all Indemnitees, including guest refunds, or (ii) incurred by any and all Indemnitees to investigate, respond to or defend a matter, including without limitation investigation and trial charges, costs and expenses, attorneys' fees, experts' fees, court costs, settlement amounts, judgments and costs of collection; and (y) the "Returned Check Fee" we then specify in the System Standards Manual ($20.00 on the Effective Date) if the drawee dishonors any check that you submit to us.

<u>Maintenance Standards</u> means the standards specified from time to time in the System Standards Manual for repair, refurbishment and replacement of FF&E, finishes, decor, and other capital items and design materials in Chain Facilities.

28

Marketing Contribution means the fee you pay to us under Section 7.1.2 and Schedule C, as amended, for advertising, marketing, training and other services.

Marks means, collectively (i) the service marks associated with the System published in the System Standards Manual from time to time including, but not limited to, the name, design and logo for "Howard Johnson" and other marks (U.S. Reg. Nos. 1,506,553; 714,495; 836,077; 1,506,552; 1,385,515; and 1,530,295) and (ii) trademarks, trade names, trade dress, logos and derivations, and associated good will and related intellectual property interests.

Marks Standards means standards specified in the System Standards Manual for interior and exterior Mark-bearing signage, advertising materials, china, linens, utensils, glassware, uniforms, stationery, supplies, and other items, and the use of such items at the Facility or elsewhere.

Minor Renovation means the repairs, refurbishing, repainting, and other redecorating of the interior, exterior, guest rooms, public areas and grounds of the Facility and replacements of FF&E we may require you to perform under Section 3.16.

Minor Renovation Ceiling Amount means $3,000.00 per guest room.

Minor Renovation Notice means the written notice from us to you specifying the Minor Renovation to be performed and the dates for commencement and completion given under Section 3.16.

Opening Date means the date on which we authorize you to open the Facility for business identified by the Marks and using the System.

Operations Standards means standards specified in the System Standards Manual for cleanliness, housekeeping, general maintenance, repairs, concession types, food and beverage service, vending machines, uniforms, staffing, employee training, guest services, guest comfort and other aspects of lodging operations.

Permitted Transferee means (i) any entity, natural person(s) or trust receiving from the personal representative of an owner any or all of the owner's Equity Interests upon the death of the owner, if no consideration is paid by the transferee or (ii) the spouse or adult issue of the transferor, if the Equity Interest transfer is accomplished without consideration or payment, or (iii) any natural person or trust receiving an Equity Interest if the transfer is from a guardian or conservator appointed for an incapacitated or incompetent transferor.

Punch List means the list of upgrades and improvements attached as part of Schedule B, which you are required to complete under Section 3.

Recurring Fees means fees paid to us on a periodic basis, including without limitation, Royalties, Marketing Contributions, Room Sales Charges, and other reservation fees and charges as stated in Section 7.

29

Relicense Fee means the fee your transferee or you pay to us under Section 7 when a Transfer occurs.

Reservation System or "Central Reservation System" means the system for offering to interested parties, booking and communicating guest room reservations for Chain Facilities described in Section 4.2.

Rooms Addition Fee means the fee we charge you for adding guest rooms to the Facility.

Room Sales Charge means the fees set forth in Section 7.1.3 and Schedule C, as modified in accordance with this Agreement for reservation services and other charges.

Royalty means the monthly fee you pay to us for use of the System under Section 7.1. "Royalties" means the aggregate of all amounts owed as a Royalty.

Service Interruption Fee means the fee you pay us when we suspend Central Reservation System service because you default under this Agreement, in the amount specified in Schedule C.

System means the comprehensive system for providing guest lodging facility services under the Marks as we specify which at present includes only the following:  (a) the Marks; (b) other intellectual property, including  Confidential Information, System Standards Manual and know-how; (c) marketing, advertising, publicity and other promotional materials and programs; (d) System Standards; (e) training programs and materials; (f) quality assurance inspection and scoring programs; and (g) the Reservation System.

System Standards means the standards for the participating in the System published in the System Standards Manual, including but not limited to Design Standards, FF&E Standards, Marks Standards, Operations Standards, Technology Standards and Maintenance Standards and any other standards, policies, rules and procedures we promulgate about System operation and usage.

System Standards Manual means the Standards of Operation and Design Manual, and any other manual we publish or distribute specifying the System Standards.

Taxes means the amounts payable under Section 7.2 of this Agreement.

Technology Standards means standards specified in the System Standards Manual for local and long distance telephone communications services, telephone, telecopy and other communications systems, point of sale terminals and computer hardware and software for various applications, including, but not limited to, front desk, rooms management, records maintenance, marketing data, accounting, budgeting and interfaces with the Reservation System to be maintained at the Chain Facilities.

Term means the period of time during which this Agreement shall be in effect, as stated in Section 5.

30

Termination means a termination of the License under Sections 11.1 or 11.2 or your termination of the License or this Agreement.

Transfer means (1) an Equity Transfer, (2) you assign, pledge, transfer, delegate or grant a security interest in all or any of your rights, benefits and obligations under this Agreement, as security or otherwise without our consent as specified in Section 9, (3) you assign (other than as collateral security for financing the Facility) your leasehold interest in (if any), lease or sublease all or any part of the Facility to any third party, (4) you engage in the sale, conveyance, transfer, or donation of your right, title and interest in and to the Facility, (5) your lender or secured party forecloses on or takes possession of your interest in the Facility, directly or indirectly, or (6) a receiver or trustee is appointed for the Facility or your assets, including the Facility. A Transfer does not occur when you pledge or encumber the Facility to finance its acquisition or improvement, you refinance it, or you engage in a Permitted Transferee transaction.

"You" and "Your" means and refers to the party named as licensee identified in the first paragraph of this Agreement and its Permitted Transferees.

"We", "Our" and "Us" means and refers to Howard Johnson International, Inc., a Delaware corporation, its successors and assigns.

HJEXC1
179820.3  Q2/05

## SCHEDULE A

(Legal Description of Facility)

HJEXC1
179820.3  Q2/05

FROM :                          PHONE NO. :                          May. 11 2006 04:50PM P6

## SCHEDULE A

ALL that certain plot, piece or parcel of land with the buildings and improvements thereon erected, situate, lying and being in the Borough and County of Bronx, City and State of New York, bounded and described as follows:

BEGINNING at a point on the easterly side of Major Deegan Boulevard, 312.25 feet northerly from the corner formed by the intersection of the Easterly side of Major Deegan Boulevard and the Northerly side of West 167th Street;

RUNNING THENCE Easterly, 100.00 feet to a point;

THENCE Northerly at right angles with the last mentioned course, 75.05 feet to a point;

THENCE Easterly at right angles with the last mentioned, 10.55 feet to a point on the Westerly side of West, 169th Street;

THENCE Northerly along the westerly side of West 169th Street with the interior angle of 68 degrees 05 minutes 44 seconds with the last mentioned course and distance of 93.19 feet to a point;

THENCE Northerly along the Westerly side of West 169th Street with an interior angle of 200 degrees 51 minutes 10 seconds 84.81 feet to a point;

THENCE Westerly with an interior angle of 86 degrees 42 minutes 27 seconds with the last mentioned course, a distance of 49.53 feet to the Easterly side of Major Deegan Boulevard said point being a distance of 69.80 feet South of the intersection of the Easterly side of Major Deegan Boulevard and the Southerly side of Sedgwick Avenue;

THENCE Southerly with an interior angle of 104 degrees 54 minutes 17 seconds with the last mentioned course, a distance of 26.28 feet to a point of tangency on a curve running along Major Deegan Boulevard;

THENCE Southerly along the Easterly side of Major Deegan Boulevard and along said curve having a Radius of 1182.50 feet with the length of 217.95 feet to the point or place of BEGINNING.

PREMISES known as 1300 Sedgwick Avenue, a/k/a 1290-1300 Major Deegan Blvd., Bronx, NY and designated as Section 9 Block 2530 Lot 32 as shown on the Tax Map of the City of New York, County of the Bronx.

BEING the same premises conveyed to the grantor from Exxonmobil Oil Corporation, f/k/a Mobil Oil Corporation, by deed dated 11/5/02 and recorded 4/7/03 as CRFN 20030000B0003.

This conveyance has been made with the consent of the holders of at least two-thirds of the outstanding shares of the party of the first part entitled to vote thereon at a meeting duly called.

## SCHEDULE B

PART I:        YOUR OWNERS:

| Name | Ownership Percentage | Type of Equity Interest | Office Held (Title) |
|------|----------------------|-------------------------|---------------------|
| **Gaurang Parikh** | **50%** | **Member** | |
| **Kiran Dave** | **50%** | **Member** | |

PART II:        THE FACILITY:

Primary designation of Facility: Howard Johnson **Inn**

Number of approved guest rooms: **43**

Parking facilities (number of spaces, description): **at least 43**

Other amenities, services and facilities:

PART III:        DESCRIPTION AND SCHEDULE OF RENOVATIONS TO BE
COMPLETED AS THE IMPROVEMENT OBLIGATION:

_____
Initial

33

HJEXC1
179820.3  Q2/05

HOWARD JOHNSON INTERNATIONAL, INC.
SCHEDULE C
April 2005

A.    Marketing Contribution

The Marketing Contribution is 2% of Gross Room Revenues. We may increase or adjust such Marketing Contribution from time to time if either approved by the Board of Directors of the INOC or its successor sanctioned as such by us or approved by a majority vote (which shall be counted on the basis of one Facility, one vote) of INOC members in good standing, present and voting at a general membership meeting or at a special meeting called for that purpose by the Board of Directors upon at least 15 days' notice from us.

B.    Guest Loyalty Marketing Fee

We charge a Guest Loyalty Marketing Fee for your participation in the TripRewards® or successor guest loyalty program. Under TripRewards, program members staying at qualifying rates at Chain Facilities earn their choice of TripRewards points, airline miles or other program currency. TripRewards points are redeemable for free stays at Chain Facilities and for travel, merchandise, entertainment and other awards. The Guest Loyalty Marketing Fee is up to 5% of the Gross Room Revenues accruing from each qualifying stay at the Facility. We will proactively match and award members with points or other program currency they earn on qualified stays even if they do not present their TripRewards membership card upon check–in. You will be billed monthly in arrears for qualifying stays by program members during the preceding month.

C.    Room Sales Charge

The Room Sales Charge is 2.5% of Gross Room Revenues. Notwithstanding the above, we may change the Room Sales Charge on a Chain-wide basis, after 60 days written notice to licensees, to cover costs (including reasonable direct or indirect overhead costs) related to such services and programs or the cost of additional services or programs.

D.    GDS and Internet Booking Fees

We will charge you under our Central Commission Payment Program either a GDS Fee or an Internet Booking Fee for reservations processed through the global distribution systems ("GDS"), including any operated by an affiliate, or the Internet for your Facility. The GDS Fee described in Section 7 is $4.50 per reservation processed through any GDS or through any Internet website powered by a GDS. Internet-originated reservations carry fees of $3.50 per reservation booked through sources other than GDS powered websites or our Chain website. GDS and Internet-originated reservations may also carry a commission if the originator qualifies. If a guest cancels a GDS or Internet-originated reservation using the same source as was used to originate the reservation, you will not be charged the applicable fee.

34

E. .   Additional Reservation System Charges

Agency and other commissions are typically 10% of the Gross Room Revenues generated by each reservation booked by an agency or other qualifying originator, plus our service charge of .75% of commissionable revenue.  Agencies which are part of a travel consortium or a travel management company, including our affiliates, may charge additional commissions of up to 5% and/or participation fees to be included in their programs.  The general sales agent commission (also known as the international sales office commission) is 15% of the Gross Room Revenues generated by each reservation originated in an area served by a general sales agent/international sales office and includes the agency commission.  The "property to property" incentive sales commission is 10% of the Gross Room Revenues generated from each reservation originated by another Chain Facility through the Central Reservation System, plus our service charge of .75% of commissionable revenue.

We may assess you for additional fees or commissions charged us by distribution channels, travel intermediaries and retailers or for performing other services.  By accepting reservations from the GDS, Internet, travel agencies and other intermediaries, you agree to participate in our Central Commission Payment Program and to reimburse us for any fees or commissions we pay to them on your behalf.

If we suspend Central Reservation System service because of your default under this Agreement, then you must pay us a Service Interruption Fee of $200 before we restore service.

You must (i) make available through the Central Reservation System and the Chain website room rates equivalent to those offered to the general public by third parties that you authorize to offer and sell reservations for the Facility's guest rooms and (ii) participate in the Chain's Best Available Rate Guarantee Program according to its published requirements.  Beginning June 1, 2004 if a guest finds a lower publicly available rate on the Internet than the "Best Available Rate" you offer through the Chain website or the Central Reservation System for the same date and accommodations and the guest meets all Program requirements, you must provide the first room night to the guest without a room charge. You may collect standard incidental fees, charges and taxes.  We will also charge you a Processing Fee of $25 to reimburse us for our administrative charges of handling the complaint.

We will offer you the opportunity to participate in certain Internet distribution channel marketing and reservation activity with third parties including our affiliates. Under one type of arrangement, you will offer rooms for sale through an electronic distribution channel on which you will be paid a net, non-commissionable rate if and when the rooms are sold by the distribution channel at its marked-up rate. For providing and managing this activity we may receive commissions from the Internet distribution channels based · upon the mark-up or room rates that they receive for renting your rooms. The net rate you receive, not the mark-up retained by the channel, should be included in Gross Room Revenues. We will allocate these commissions to Royalties and Marketing Contributions in equal proportions. Under another type of arrangement, you will offer rooms for sale through an electronic distribution channel at your best commissionable rate. The distribution channel will not mark-up these rates but will charge you a commission of up to 15% on consumed room nights.

35

We or an affiliate may charge you a sales agent commission of up to 10% of the Gross Room Revenues generated from consumed reservations booked by members of affinity groups and organizations participating in our Member Benefits sales program. We or our affiliate usually pays a portion of this commission to the affinity group or organization in exchange for promoting the Member Benefits program to its members.

F.      Guest Services Assessment

We will contact you if we receive any guest complaint about you or the Facility, and you will be responsible for resolving the complaint to the satisfaction of the guest. If you do not respond to any complaint within 7 business days after we refer it to you and the guest contacts us again to seek resolution, we will charge you a "Guest Services Assessment" of $75.00, plus the costs we incur to settle the matter with the guest. In addition, if the number of guest complaints per 1,000 occupied roomnights about you or the Facility in a calendar year exceed the "Annual Facility Allotment" we establish with the approval of the Board of Directors of the INOC, we will charge you a "Processing Fee" of $25.00 for each additional complaint we receive during that year, regardless of whether you are able to resolve it to the guest's satisfaction. We may change or eliminate the Guest Services Assessment, the Processing Fee, the Annual Facility Allotment and/or the time for responding to or resolving a guest complaint on a Chain-wide basis at any time upon 30 days advance notice, with the approval of the INOC Board. The Guest Services Assessment and the Processing Fee are intended only to reimburse us for the costs of complaint handling and are not intended as penalties or liquidated damages. All guest complaints remain subject to indemnification under this Agreement.

HJEXCI
179820.3  Q2/05

## GUARANTY

To induce HOWARD JOHNSON INTERNATIONAL, INC., its successors and assigns ("you") to sign the License Agreement (the "Agreement") with the party named as the "Licensee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Licensee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Licensee's obligations under the Agreement, including any amendments, will be punctually paid and performed.

Upon default by Licensee and notice from you we will immediately make each payment and perform or cause Licensee to perform, each unpaid or unperformed obligation of Licensee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Licensee, or settle, adjust or compromise any claims against Licensee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Licensee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.

WITNESSES:                                        GUARANTORS:

_____          _____ (Seal)
                                                       Gaurang Parikh

_____          _____ (Seal)
                                                       Kiran Dave

HJEXC1
179820.3  Q2/05

**Exhibit B**
Certification of ADA Compliance
Facility Evaluation

**Instructions...**

Under the Americans with Disabilities Act (ADA), all new hotels, motels, inns, and other places of lodging must be readily accessible to and usable by persons with disabilities. This form is designed to help architects, building contractors, and licensees of newly constructed facilities ensure that a facility complies with the ADA requirements.

The form consists of four parts:  **(1) Instructions; (2) Survey Tools and Techniques; (3) an Accessibility Certification Worksheet, and (4) a Certification Form.** The Instructions explain how to complete the Accessibility Certification Worksheet and the Certification Form. Survey Tools and Techniques explains how to make certain measurements required to complete the Accessibility Certification Worksheet. The Accessibility Certification Worksheet lists some of the most common accessibility problems identified during a survey of numerous lodging facilities and requires you to determine whether these problems exist at your place of lodging. The Certification Form provides a means for obtaining written confirmation from the architect of record who designed the facility, the general contractor who built it, or a consulting architect to certify that the facility is readily accessible to and usable by persons with disabilities as required by the ADA. The form is designed to be completed by the architect of record, the general contractor, or a consulting architect. In some instances, a licensee may also complete the form. The person completing this form must:

**Be familiar with the ADA Title III, Regulations including the Standards for Accessible Design.** The ADA Standards for Accessible Design (28 C.F.R. pt. 36, Appendix A) are a regulation published by the U.S. Department of Justice that sets out detailed architectural requirements for many types of buildings, including places of lodging. A place of lodging is not readily accessible to and usable by persons with disabilities unless it complies with all applicable requirements in the ADA Standards. However, if your facility meets the requirements of this form, including the certification obligation, your facility complies with the ADA Standards. For a free copy of the regulations, including the ADA Standards, call the ADA Information Line at 1-800-514-0301.

**Inspect the facility.** The Accessibility Certification Worksheet and the Certification Form cannot be completed without conducting an on-site inspection of the facility to make visual observations and take specific measurements. The Survey Tools and Techniques section of the form explains how to make certain measurements required to determine if a facility is accessible.

**Complete the Accessibility Certification Worksheet.** The Accessibility Certification Worksheet lists some of the most common accessibility problems at mid-economy places of lodging.  If you cannot answer "Yes" or "Not Applicable" ("N/A") to all of the questions on the Accessibility Certification Worksheet, then the place of lodging is not accessible to persons with disabilities, it does not comply with ADA requirements, and accessibility problems must be fixed before you can be admitted into the lodging system.

**Complete the Certification Form.** You cannot complete the Certification Form until you have familiarized yourself with the ADA Standards, have inspected the facility, have completed the Accessibility Certification Worksheet, and can answer "Yes" or "Not Applicable" ("N/A") accurately to all questions in Section II of the Certification Form.

In a few instances, the architect of record, the general contractor, and one or more consulting architect(s) may refuse to complete the Accessibility Certification Worksheet and the Certification Form. If this occurs, the licensee may complete the Accessibility Certification Worksheet and the Certification Form *so long as the licensee has no reason to believe that the architect of record, the general contractor, or any consulting architect refused to complete the form because the facility is not accessible.*                    ***September 1999 Edition***

38

**Survey Tools and Techniques**
**Facility Evaluation - Checklist of Frequent Errors**

**I. Required Survey Tools...**

The following tools will be required to allow you to accurately complete the Accessibility Certification Worksheet:

      A. Stiff Metal Tape Measure (12' min. length).
      B. 24" Long Builders' Level (Square Edged).
      C. Clipboard and Worksheet.
      D. Pencil.

**II. Tips and Techniques...**

**A. Measuring Slope and Cross Slope.** Surveying ramps, parking spaces, access aisles, door approaches and sidewalks will require you to determine if the slopes *(ie.:* in the direction of travel) and cross slopes *(i.e.:* slopes tilting side to side) are within the limits allowed by the ADA Standards for Accessible Design ("Standards"). There are three primary ways to determine a given slope:

      1. Hire a land surveyor to shoot grades;
      2. Use a digital "slope meter"; and,
      3. Use a 24' long builders' level and tape measure.

Each of these methods will provide the information you need. The simplest method is the third option of using the level and tape measure as described below.

First, observe the general slope of the surface and place the builders' level on the pavement at the steepest point parallel to the direction of the slope. While holding the uphill end of the level on the pavement, place the pencil under the other end and roll it toward the uphill end of the level until the horizontal air bubble in the center of the level is itself centered in the little glass cylinder. This means that the level is perfectly horizontal. Now, take the tape measure and measure the open gap at the downhill end of the level, as shown in the photo below - this the "critical dimension". As you will note in the Accessibility Certification Worksheet, three maximum slopes have been specified by the Standards:

      ***For a 24 " long builders' level...***
      1/2" critical dimension ---- 1:48 slope
      1 1/4" critical dimension --- 1:20 slope (approx)
      2" critical dimension --- 1:12 slope

Certification of ADA Compliance
Facility Evaluation
179820.3  Q2/05

**Photo of How to Measure Slope**



**B. Measuring Clear Passage at Doors.** Verifying the clear passage width at standard hinged doors requires an understanding of exactly where to measure. The photo below shows that you measure horizontally from the face of the door in its 90 degree open position to the surface of the door stop on the frame opposite the hinge. *The 21 " clear passage width shown below is too narrow to allow wheelchair passage. It should beat least 32".* If a pair of doors are at an opening, measure the clear passage width of only one (the widest) door - this clear passage width is not allowed to be determined by opening both doors.

**Photo of How to Measure Clear Passage
Width at a Door**



40

## Accessibility Certification Worksheet
### Lodging Facility Evaluation – Checklist of Frequent Errors

**I. Parking and Loading Zone...**

A.  Are at least the minimum number of accessible parking spaces provided, including "van accessible" spaces?                                        *[ADA Stds 4.1.2(5)]* [1]

☐ Yes          ☐ *No*

| <u>Total Spaces in Lot</u> | <u>Acc. Spaces Req'd.</u> |
|---|---|
| 1-25 | 1 van |
| 26-50 | 1 std. + 1 van |
| 51-75 | 2 std. + 1 van |
| 76-100 | 3 std. + 1 van |
| 101-150 | 4 std. + 1 van |
| 151-200 | 5 std. + 1 van |

*Standard Accessible parking space is 8' min. + 5' acc. aisle*

*Van Spaces are 8' min. wide + 8' access aisle*

B.  Does each accessible parking space have or share an adjacent access aisle?    *[ADA Stds. 4.6.3]*

☐ Yes          ☐ *No*

C.  Do the parking spaces and access aisles have surface slopes less than 1:48 (i.e.: when measured as shown on page 2, is the critical dimension 1/2" or less)?        *[ADA Stds. 4.6.3]*

☐ Yes          ☐ *No*

D.  Does each accessible parking space have a post- or wall-mounted sign with symbol of accessibility?                                        *[ADA Stds. 4.6.4]*

☐ Yes  ☐ *No*

E.  Are the level surfaces of accessible parking spaces and access aisles free of built-up curb ramps?                                        *[ADA Stds. 4.6.3]*

☐ Yes          ☐ *No*

F.  Are the accessible parking spaces the closest parking spaces to the lobby entrance and accessible guestroom entrances?                        *[ADA Stds. 4.6.2]*

☐ Yes          ☐ *No*

G.  Does all of the pavement at the covered loading zone slope 1:48 or less (critical dimension of ½" or less)?                                        *[ADA Stds. 4.6.6]*

☐ Yes          ☐ *No*

---

[1]  Following each question on the Accessibility Certification Worksheet is a reference to the ADA Standards for Accessible Design, 28 C.F.R. pt. 36, Appendix A.  This reference identifies the section of the ADA Standards that sets out the requirements described in the question.

Certification of ADA Compliance
Facility Evaluation
179820.3 Q2/05

## II. Exterior Accessible Route...

A. Regarding the exterior routes (sidewalks), are there no steps, no level changes over 1/4", and no unramped curbs between...

1. ...the accessible parking space access aisles and the entrance door to the lobby?   *[ADA Stds. 4.1.2(1)]*

☐ Yes        ☐ No

2. ...the accessible parking space access aisles and the doors to the accessible guestroom(s)?
*[ADA Stds. 4.1.2(1)]*

☐ Yes        ☐ No

3. ...the passenger loading zone and the entrance door to the front lobby?   *[ADA Stds. 4.1.2(1)]*

☐ Yes        ☐ No

4. ...the lobby and the accessible guestrooms?   *[ADA Stds. 4.1.3(1)]*

☐ Yes        ☐ No

5. ...the accessible guestroom(s) and the pool or any other exterior amenities provided?
*[ADA Stds. 4.1.2(2)]*

☐ Yes        ☐ No

6. ...the public sidewalk, if provided, and the entrance door to the lobby?   *[ADA Stds. 4.1.2(1)]*

☐ Yes        ☐ No

B. Examine each of the exterior routes described above, to confirm the following:

1. ...do all of the sidewalks have cross slopes *(i.e.: slopes tilting side to side)* that are less than 1:48
   (critical dimension of 1/2" or less)?   *[ADA Stds. 4.3.7]*

☐ Yes        ☐ No

2. ...excluding existing ramps, do all of the sidewalks have running slopes (*i.e.:* in the direction of travel)
   that are no greater than 1:20 (1 1/4" critical dimension or less)?   *[ADA Stds. 4.3.7]*

☐ Yes        ☐ No

3. ...is the usable width of all sidewalks at least 36" wide, even when cars project over the curb onto the
sidewalk?   *[ADA Stds. 4.3.3]*

☐ Yes        ☐ No

4. ...are all sidewalks free of any trees/shrubs and wall mounted objects *(i.e.:* fire extinguishers, wall-
   mounted lights, electrical meters, signs, pay phones, etc.) that pose a hazard to blind guests by
   projecting into the path more than 4"?   *[ADA Stds. 4.4]*

☐ Yes        ☐ No

42



*ADA Stds. Figure 8(a) - Walking Parallel to a Wall*

5. ...is there a top landing at least 36" long at each curb ramp to allow the accessible route to bypass the curb ramp?     *[ADA Stds. 4.3.3; 4.3.7]*

☐ Yes     ☐ No

6. ...are all curb ramps at least 36" wide, exclusive of the flared sides of the ramp?   *[ADA Stds. 4.7.3]*

☐ Yes     ☐ No

7. ...do all curb ramps have running slopes of 1:12 or less (critical dimension of 2" or less)?

*[ADA Stds. 4.7.2]*

☐ Yes     ☐ No

8. ...are all other exterior ramps at least 36" wide?     *[ADA Stds. 4.8.3]*

☐ Yes     ☐ No

9. ...do all exterior ramps have running slopes of 1:12 or less (critical dimension of 2" or less)?

*[ADA Stds. 4.8.2]*

☐ Yes     ☐ No

10. ...do all exterior ramps have top and bottom landings that are level, at least as wide as the ramps they serve and at least 60" long?     *[ADA Stds. 4.8.4]*

☐ Yes     ☐ No

11. ...are the exterior stairs built so a person with a vision impairment cannot hit his/her head on the underside *(i.e.:* protected with a cane detectable warning, such as the rail as shown below or enclosed with walls so a continuous 80" high circulation path is provided for building users)?

*[ADA Stds. 4.4.2]*

☐ Yes     ☐ No

43



*ADA Stds. Figure 8(c-1) - Overhead Hazards*

### III. Lobby Entrance...

A.   Is the sidewalk in front of the lobby door level, without any portion steeper than 1:48 (critical dimension of 1/2" or less)?                     *[ADA Stds. 4.1.6; 4.8.4(4)]*

☐ Yes          ☐ No

B.   Do the lobby entrance doors allow at least 32" clear passage width?          *[ADA Stds. 4.13.5]*

☐ Yes          ☐ No

C.   Is the door hardware (lever, pull, panic bar, etc.) easy to open using only one hand?
                                                                    *[ADA Stds. 4.13.9]*

☐ Yes          ☐ No

D.   Does the vestibule, if provided, measure at least 7' between the exterior door frame and interior door frame?                                       *[ADA Stds. 4.13.7]*

☐ Yes          ☐ No          ☐ N/A

### IV. Front Lobby...

A.   Does the registration counter have a lowered portion no more than 36" high or is there a pull-out section at 28-34" high to allow wheelchair users to fill out registration forms?     *[ADA Stds. 7.2; 4.32.4]*

☐ Yes          ☐ No

B.   Is the portion of the lobby used for breakfast service approachable and usable without having to use steps or stairs?                              *[ADA Stds. 4.3.8]*

☐ Yes          ☐ No

C.   Does the counter used for serving breakfast have at least a 36" long section that is no higher than 36" above the floor?                           *[ADA Stds. 7.2]*

☐ Yes          ☐ No

44

D.  Are the self-serve food or drink dispensers (juice, coffee, cereal units, etc.) without:

1. ...operational controls higher than 54"?                                    *[ADA Stds. 5.5]*

☐ Yes            ☐ No

2. ...operational controls higher than 46" if they are set back 10"-24" from the edge of the counter?
                                                                               *[ADA Stds. 5.5]*

☐ Yes            ☐ No

E.  Do at least 5% of the breakfast tables have tops at 28"-34" high, with at least 27" high knee space
under the table?                                                *[ADA Stds. 5.1; 28CFR36.304]*

☐ Yes            ☐ No

**V.  Interior Accessible Routes...**

A.  Are hallways and corridors free of any steps or vertical level changes over 1/4" between:
                                                                               *[ADA Stds. 4.1.3(1)]*

1. ...the lobby and the public restrooms?

☐ Yes            ☐ No

2. ...the lobby and any meeting rooms?

☐ Yes            ☐ No            ☐ *N/A*

3. ...the lobby and the guest laundry room?

☐ Yes            ☐ No            ☐ *N/A*

4. ...the lobby and any other public use rooms *(i.e.:* exercise rooms, vending areas, etc.)?

☐ Yes            ☐ No            ☐ *N/A*

5. ...the lobby and accessible guestroom(s)?

☐ Yes            ☐ No

B.  Examine each of the interior routes described above:

1. ...do all of the corridors have running slopes *(i.e.:* in the direction of travel) not more than 1:20 (critical
dimension of 1 1/4" or less), excluding existing ramps?                    *[ADA Stds. 4.3.7; 4.8]*

☐ Yes            ☐ No

45

2. ...are all of the corridors into which at least one door swings at least 54" wide to allow for wheelchair maneuvering at doors? *[ADA Stds. 4.13.6]*

☐ <u>Yes</u>      ☐ *No*

3. ...are all sidewalks free of any trees/shrubs and wall-mounted objects (*i.e.*: fire extinguishers, wall-mounted lights, electrical meters, signs, pay phones, etc.) that pose a hazard to blind guests by projecting into the path more than 4"? *[ADA Stds. 4.4]*

☐ <u>Yes</u>      ☐ *No*

4. ...are the exterior stairs built so a person with a vision impairment can not hit his/her head on the underside (see Fig. 8(c-1) on page 4)? *[ADA Stds. 4.4.2]*

☐ <u>Yes</u>      ☐ *No*

5. ...are all interior ramps at least 36" wide between the two handrails? *[ADA Stds. 4.8.3]*

☐ <u>Yes</u>      ☐ *No*      ☐ *N/A*

6. ...do all interior ramps have running slopes that are 1:12 or less (critical dimension of 2" or less)? *[ADA Stds. 4.8.2]*

☐ <u>Yes</u>      ☐ *No*      ☐ *N/A*

7. ...do all interior ramps have top and bottom landings that are level, at least 60" long, and at least as wide as the ramps they serve? *[ADA Stds. 4.8.4]*

☐ <u>Yes</u>      ☐ *No*      ☐ *N/A*

8. ...with the exception of doors at shallow closets, do all doors in the hotel allow at least 32" clear passage width? *[ADA Stds. 4.13.5; 9.4]*

☐ <u>Yes</u>      ☐ *No*      ☐ *N/A*

9. ...with the exception of guest rooms not designated as accessible, do all doors have door hardware (levers, pulls, panic bars, etc.) that is easy to open using only one hand? *[ADA Stds. 4.13.9]*

☐ <u>Yes</u>      ☐ *No*

10. ...with the exception of guest rooms not designated as accessible, do all doors have adequate room for a wheelchair user to approach from the pull side and pull it open without the door hitting the wheelchair? (Note: this requires at least 18" of wall space on the latch side of the door.) *[ADA Stds. 4.13.6]*

☐ <u>Yes</u>      ☐ *No*

C.  If the hotel has more than 2 stories, including any basement levels, is there a full size passenger elevator serving each level of the hotel, including the basement? *[ADA Stds. 4.1.3(5)]*

☐ <u>Yes</u>      ☐ *No*      ☐ *N/A*

46

D.   In hotels that do not have a fire sprinkler system serving every room, are there two 30"x48" wheelchair waiting areas (a.k.a. "an area of rescue assistance" linked to the front desk by intercom) at each stair landing above or below the ground floor?          *[ADA Stds. 4.1.3(9); 4.3.1.2]*

☐ Yes          ☐ *No*          ☐ *N/A*

E.   Are there floors connected only by stairs, not an elevator or ramp?          *[ADA Stds. 4.1.3(4)]*

☐ Yes          ☐ *No*          ☐ *N/A*

*If yes, then...*          *[ADA Stds. 4.9]*

1. ...do the stairs have closed risers?

☐ Yes          ☐ *No*

2. ...are all treads at least 11" deep, measured riser to riser?

☐ Yes          ☐ *No*

3. ...are there handrails on both sides of the stair at 34" - 38" above the slope of the stair?

☐ Yes          ☐ *No*

4. ...do the handrails extend horizontally at the top and bottom of each stair?

☐ Yes          ☐ *No*

5. ...are the handrails continuously grippable, without interruption by vertical supports, newel posts or other construction elements?

☐ Yes          ☐ *No*

## VI.  Public Restrooms...

A.  Is each public restroom accessible with at least one accessible stall/toilet, one accessible lavatory and one accessible urinal (if urinals are provided)?          *[ADA Stds. 4.1.3(11); 4:22]*

☐ Yes          ☐ *No*

B.  Is each accessible toilet centered 18" from the adjacent side wall?          *[ADA Stds. 4.16.2; 4.17.3]*

☐ Yes          ☐ *No*

C.  Does each accessible toilet have a horizontal grab bar on the adjacent side wall that is at least 40" long and between 33" - 36" above the floor?          *[ADA Stds. 4.16.4; 4.17.6]*

☐ Yes          ☐ *No*

47

D.  Does each accessible toilet have a horizontal grab bar on the wall behind the toilet that is at least 36" long and between 33" - 36" above the floor?                                *[ADA Stds. 4.16.4; 4.17.6]*

☐ <u>Yes</u>          ☐ *No*

E.  If the accessible toilet is in a stall, does the stall measure at least 60" wide and 56" deep?

*[ADA Stds. 4.17.3]*

☐ <u>Yes</u>          ☐ *No*          ☐ *N/A*

F.  If the accessible toilet is in a stall, is the stall door positioned diagonally opposite, not directly in front of the toilet?          *[ADA Stds. 4.17.3]*

☐ <u>Yes</u>          ☐ *No*          ☐ *N/A*

G.  Is there at least one lavatory (wash basin) in each public restroom that has each of the following characteristics...

1. ...a 29" high clearance under the front edge and the top of the bowl no higher than 34" above the floor?                                *[ADA Stds. 4.22.6; 4.19.2]*

☐ <u>Yes</u>          ☐ *No*

2. ... insulated drain and hot water pipes or other means of preventing contact while still allowing for adequate knee clearance for wheelchair users?          *[ADA Stds. 4.19.4]*

☐ <u>Yes</u>          ☐ *No*

3. ...a faucet that is easily operable with one hand (*i.e.*: levers, wrist blades, single arm, etc.)?                                *[ADA Stds. 4.19.5]*

☐ <u>Yes</u>          ☐ *No*

H.  Is there adequate room for a wheelchair user to approach the restroom door from the pull side and pull it open without it hitting the wheelchair - this requires at least 18" of wall space on the latch side of the door?                                *[ADA Stds. 4.13.6]*

☐ <u>Yes</u>          ☐ *No*

*ADA Stds. Figure 25(a) - Full Side, Front Approach*

I.  Somewhere in each public restroom, is there an area in which a wheelchair user can turn around - either a 60" diameter circle or a "T"-shaped turn area as shown in Figure 3 below?

*[ADA Stds. 4.22.3; 4.2.3]*

☐ <u>Yes</u>          ☐ *No*

48

J.  Where there are vestibules between the public restroom(s) and the hall, is there adequate space (at least 7') for a wheelchair user to enter and operate each door without another door closing on him/her?

[ADA Stds. 4.13.7]

☐ Yes        ☐ No        ☐ N/A

**VII.  Interior Signs...**

A.  If the following rooms have a sign, is it a tactile (raised letters & Braille) sign mounted on the wall (not the door) to the latch side of the door and centered 60" above the floor?     [ADA Stds. 4.1.3(16)(a)]

| Room/Area | Yes | No | N/A |
|---|---|---|---|
| Lobby/Front Desk | | | |
| Office | | | |
| Public Restrooms | | | |
| Meeting Rooms | | | |
| Business Center | | | |
| Exercise Room | | | |
| Game Room | | | |
| Guest Laundry | | | |
| Interior Swimming Pool | | | |
| Guestrooms | | | |
| Mechanical Rooms | | | |
| Other Public Rooms | | | |
| Other Employee Rooms | | | |

B.  Are all signs at this lodging facility made without brass, chrome, gold, glass, mirror or any other reflective material used as text or background and have letters and numbers that contrast with the background, or if such signs are used, are there duplicate signs having a non-glare finish and high contrast lettering?     [ADA Stds. 4.1.3(16); 4.30.5]

☐ Yes        ☐ No



*ADA Stds. Figure 3 - Wheelchair Turning Space 60" Diameter Space & "T"-Shaped Space*

**VIII: Fire Alarm System...**

A. If the building has an audible fire alarm system, do each of the following rooms in the hotel have a visual alarm strobe light mounted on the wall at 80" above the floor to alert deaf guests about emergency situations?                    *[ADA Stds. 4.1.3(14)]*

| Room/Area | Yes | No | N/A |
|---|---|---|---|
| Lobby/Front Desk | | | |
| Public Corridors | | | |
| Public Restrooms | | | |
| Meeting Rooms | | | |
| Business Center | | | |
| Exercise Room | | | |
| Game Room | | | |
| Guest Laundry | | | |
| Interior Swimming Pool | | | |
| Other Public Rooms | | | |
| Employee Break Room | | | |
| Accessible Guestrooms | | | |
| Guestrooms for Guests with Hearing Impairments | | | |

**IX: General Guestroom Issues...**

A. Do guestroom entry doors and connecting room doors in all guestrooms allow 32" clear passage width?                    *[ADA Stds. 9.4]*

☐ Yes        ☐ No

B. Do bathroom doors in all guestrooms allow 32" clear passage width?          *[ADA Stds. 9.4]*

☐ Yes        ☐ No

**X. Accessible Guestrooms...**

A. Does the hotel have the proper number of accessible guest rooms and accessible guestrooms with roll-in showers, based on the Table 9.1.2 below?                    *[ADA Stds. 9.1.2]*

☐ Yes        ☐ No

50

(Table 9.1.2)

| Total Rooms in Hotel | Column "A" Accessible Rooms | Column "B" Rooms with Roll-in Showers |
|---|---|---|
| 1 to 25 | 1 | 0 |
| 26 to 50 | 2 | 0 |
| 51 to 75 | 3 | 1 |
| 76 to 100 | 4 | 1 |
| 101 to 150 | 5 | 2 |
| 151 to 200 | 6 | 2 |
| 201 to 300 | 7 | 3 |

Note: *The total number of accessible guestrooms for a given number of rooms in a hotel (left column) is derived by adding together column "A" and column "B".*

B. Are the proper number of guestrooms for guests with hearing impairments provided per Table 9.1.3 below?

☐ <u>Yes</u>     ☐ *No*

(Table 9.1.3)

| Number of Rooms In the Hotel | Rooms for Hearing Impaired Guests |
|---|---|
| 1-25 | 1 |
| 26-50 | 2 |
| 51-75 | 3 |
| 76-100 | 4 |
| 101-150 | 5 |
| 151-200 | 6 |
| 201-300 | 7 |

C. Have the required accessible guestrooms been distributed among the various classes of rooms listed below...                    *[ADA Stds. 9.1.4]*

| Room/Area | Yes | No | N/A |
|---|---|---|---|
| King/Single Bed Rooms | | | |
| Rooms with Two Beds | | | |
| Connecting Rooms | | | |
| Jacuzzi Suites | | | |
| Other Suites | | | |

D. In addition, are the proper number of the following elements provided for hearing impaired users in each accessible guestroom, each accessible guestroom with a roll-in shower (if required) and the additional number of rooms for guests with hearing impairments required in table 9.1.3:

*[ADA Stds. 9.3; 28CFR36.303]*

51

| Elements for Hearing Impaired Guests | Yes | No |
|---|---|---|
| TTY (Text Telephone) | | |
| Strobe for door knock/phone call (Can't be same strobe as fire alarm) | | |
| Smoke Alarm with Strobe | | |
| Strobe linked to building-wide Fire Alarm | | |
| Closed Caption TV decoder | | |

E.  Are smoking and non-smoking accessible guestrooms provided based upon the ratio of smoking and nonsmoking guestrooms in the facility overall?                    *[ADA Stds. 9.1.4]*

☑ Yes          ☐ No

F.  Do all entry doors to designated accessible guestrooms allow at least 32" of clear passage width?
*[ADA Stds. 9.2.2(3); 4.13.5]*

☐ Yes          ☐ No

G.  Does the door hardware (levers, pulls, panic bars, etc.) on the hall doors allow for easy operation with only one hand?                              *[ADA Stds. 9.2.2(3); 4.13.9]*

☐ Yes          ☐ No

H.  Is there adequate room for a wheelchair user to approach accessible guestroom doors from the pull side and pull it open without it hitting the wheelchair - this requires at least 18" of wall space on the latch side of the door?                           *[ADA Stds. 9.2.2(3); 4.13.6]*

☐ Yes          ☐ No

I.  Is the security latch or bolt on the hall door mounted no higher than 48" above the floor?
*[ADA Stds. 9.2.2(3); 4.13.9]*

☐ Yes          ☐ No

J.  Regarding maneuvering space around the bed(s) in the accessible guestrooms...

1. ...in accessible guestrooms with one bed, is there at least a 36" wide route on each side of the bed?
*[ADA Stds. 9.2.2(1)]*

☐ Yes          ☐ No

2. ...in accessible guestrooms with two beds next to one another, is there a minimum of 36" between the two beds?                                    *[ADA Stds. 9.2.2(1)]*

☐ Yes          ☐ No

3. ...in all accessible guestrooms, is there clear passage at the foot of all beds at least 36" wide?
*[ADA Stds. 9.2.2(2)]*

☐ Yes          ☐ No

K.  Are all drapery control wands in accessible guestrooms within 54" of the floor?
*[ADA Stds. 9.2.2(5); 4.27.3]*

☑ Yes          ☐ No

52

L.  Are the controls on the HVAC units and the controls for draperies easily operable (*i.e.:* no tight pinching or twisting of the wrist) with only one hand, within 54" of the floor and can a person in a wheelchair approach and use the controls?                    *[ADA Stds. 9.2.2(5); 4.27.4]*

☐ Yes        ☐ No

M.  Are the rod and shelf in the clothes closet or wall mounted unit within 48" of the floor and can a person in a wheelchair approach and use the rod and shelf?        *[ADA Stds. 9.2.2(4); 4.25.3]*

☐ Yes        ☐ No

N.  Accessible Guestroom Bathroom Issues:

1.  Do bathroom doors in accessible guestrooms allow at least 32" of clear passage width?
*[ADA Stds. 9.2.2(3); 4.13.5]*

☐ Yes        ☐ No

2.  Is the bathroom door hardware (levers, pulls, etc.) easily operable with only one hand?
*[ADA Stds. 9.2.2(3); 4.13.9]*

☐ Yes        ☐ No

3.  Is the accessible toilet in each accessible guestroom bathroom centered 18" from the adjacent side wall?        *[ADA Stds. 9.2.2(6)(e); 4.23.4; 4.16.2]*

☐ Yes        ☐ No

4.  Does the toilet in each accessible guestroom bathroom have a horizontal grab bar along the adjacent side wall that is at least 42" long and mounted 33" - 36" above the floor?
*[ADA Stds. 9.2.2(6)(e); 4.23.4; 4.16.2]*

☐ Yes        ☐ No

5.  Does the accessible toilet in each accessible guestroom bathroom have a horizontal grab bar along the wall behind the toilet that is at least 36" long and mounted 33" - 36" above the floor?
*[ADA Stds. 9.2.2(6)(e); 4.23.4; 4.16.2]*

☐ Yes        ☐ No

6.  Is the lavatory (wash basin) in each accessible guestroom bathroom no more than 34" high with at least 29" high clearance under the front edge?        *[ADA Stds. 9.2.2(6)(e); 4.23.6; 4.19.2]*

☐ Yes        ☐ No

7.  Does the lavatory in each accessible guestroom bathroom have drain and hot water pipes that are insulated or screened off with an angled apron that still allows for adequate wheelchair knee clearance?
*[ADA Stds. 9.2.2(6)(e); 4.23.6; 4.19.4]*

☐ Yes        ☐ No

8.  Does the lavatory in each accessible guestroom bathroom have faucet hardware that is easily operable with only one hand (*i.e.:* levers, wrist blades, single arm, etc.)?   *[ADA Stds. 9.2.2(6)(e); 4.23.6; 4.19.5]*

☐ Yes        ☐ No

Certification of ADA Compliance
Facility Evaluation
179820.3  Q2/05

9.  Is there clear floor space in each accessible guestroom bathroom where a wheelchair user can turn around - either a 60" diameter circle or a "T"-Turn area as shown in Figure 3 on page 13?
*[ADA Stds. 9.2.2(6)(e)]*

☐ Yes        ☐ No

10.  Is there adequate room for a wheelchair user to approach the bathroom door in each accessible guestroom bathroom from the pull side and pull it open without it hitting the wheelchair - this requires at least 18" of wall space on the latch side of the door?        *[ADA Stds. 9.2.2(3); 4.13.6]*

☐ Yes        ☐ No

11.  Are there towel racks or bars placed no more than 54" off the floor with clear floor space allowing approach by a person in a wheelchair?        *[ADA Stds. 9.2.2(4); 4.2.6]*

☐ Yes        ☐ No

12.  Are all of the bathroom floors in the accessible guest rooms slip-resistant?    *[ADA Stds. 4.5]*

☐ Yes        ☐ No

O.  Bathtub Issues - Do bathtubs (if provided) in the designated accessible guestrooms, comply with the following:

1.  Are the tub faucet controls positioned between the center of the end wall and the open side of the tub?
*[ADA Stds. 4.23.8; 4.20.2]*

☐ Yes        ☐ No        ☐ N/A

2.  Can you turn the faucet controls on and off easily with only one hand?    *[ADA Stds. 4.23.8; 4.20.5]*

☐ Yes        ☐ No        ☐ N/A

3.  Is there a transfer tub seat (that can be fastened to the tub) available for those  with mobility impairments?        *[ADA Stds. 4.23.8; 4.20.3]*
☐ Yes        ☐ No        ☐ N/A

4.  Is there an adjustable height hand-held shower wand with a 60" long hose?  *[ADA Stds. 4.23.8, 4.20.6]*

☐ Yes        ☐ No        ☐ N/A

5.  Is there a horizontal grab bar at the foot of the tub (by the controls) that is at least 24" long?
*[ADA Stds. 4.23.8, 4.20.4]*

☐ Yes        ☐ No        ☐ N/A

6.  Is there a horizontal grab bar at the head of the tub that is at least 12" long? *[ADA Stds. 4.23.8; 4.20.4]*

☐ Yes        ☐ No        ☐ N/A

Certification of ADA Compliance
Facility Evaluation
179820.3 Q2/05

7.  Are there two horizontal grab bars (one high/one low) along the side of the tub that are at least 24"
long?                                                                    *[ADA Stds. 4.23.8; 4.20.4]*

☐ Yes          ☐ No          ☐ N/A

8.  Is the gap between the wall and the inside face of each grab bar exactly 1 ½"?
*[ADA Stds. 4.23.8; 4.20.4]*

☐ Yes          ☐ No          ☐ N/A

P.  "Roll-in" Shower Issues -

1.  If there are more than 50 total guestrooms in the hotel, are the proper number of accessible rooms with
"roll-in" showers provided per the table on page 13.  (Note that these rooms are added to the required
number of standard accessible guestrooms shown on the center column of that table)  *[ADA Stds. 9.1.2]*

☐ Yes          ☐ No          ☐ N/A

a.  If "roll-in" showers are provided in the accessible guestroom bathrooms, do they measure at least 30"
wide by 60" long or 36" wide by 60" as configured in Figure 57 below?     *[ADA Stds. 9.1.2; Fig. 57]*

☐ Yes          ☐ No          ☐ N/A

*ADA Stds. Figure 57 - Roll-in Shower with Folding Seat*

b.  Do the roll-in showers have a securely fastened folding seat onto which wheelchair users may transfer
to bathe?                                                                 *[ADA Stds. 4.21.3]*

☐ Yes          ☐ No          ☐ N/A

c.  Are the faucet controls and shower wand positioned on the wall along the side of the shower seat?
*[ADA Stds. 4.21.5]*

☐ Yes          ☐ No          ☐ N/A

d.  Is there a horizontal grab bar on the wall alongside the shower seat (but not behind the shower seat)?
*[ADA Stds. 4.21.2; Fig. 57]*

☐ Yes          ☐ No          ☐ N/A

e.  Is there a horizontal grab bar on the wall opposite the seat?         *[ADA Stds. 4.21.2]*

☐ Yes          ☐ No          ☐ N/A

55

f. Are the accessible showers free of shower doors that would impede wheelchair transfer?

*[ADA Stds. 4.21.8]*

☐ Yes ☐ No ☐ N/A

g. Are all of the roll-in showers free of curbs or lips at the shower floor?   *[ADA Stds. 4.21.7]*

☐ Yes ☐ No ☐ N/A

h. Can you easily operate the faucet controls with only one hand?   *[ADA Stds. 4.21.5]*

☐ Yes ☐ No ☐ N/A

i. Is there an adjustable height shower wand with at least a 60" long hose?   *[ADA Stds. 4.21.6]*

☐ Yes ☐ No ☐ N/A

j. Does each grab bar have a gap exactly 1 ½" wide between the wall and the inside face of the grab bar?

*[ADA Stds. 4.21.4]*

☐ Yes ☐ No ☐ N/A

Certification of ADA Compliance
Facility Evaluation
179820.3  Q2/05

# Certification Form
### Facility Evaluation

I. **Facility Address**...

II. **Certification Questions**:...

A. Did you complete the Accessibility Certification Worksheet for the place of lodging identified above?

☐ *Yes*    ☐ *No*

B. Did you answer "yes" or "not applicable" (N/A) truthfully to all of the questions on the Accessibility Certification Worksheet?

☐ *Yes*    ☐ *No*

C. Did you inspect the place of lodging before completing the Accessibility Certification Worksheet and this Certification Form?

☐ *Yes*    ☐ *No*

D. Have you reviewed all of the ADA regulations in 28 C.F.R. pt. 36 including the Standards for Accessible Design in Appendix A (the "ADA Standards") that are applicable to places of lodging?

☐ *Yes*    ☐ *No*

E. Does the place of lodging comply with all applicable ADA Standards?

☐ *Yes*    ☐ *No*

*(Note: Section III, IV or V must be completed)*

III. **Architects Certification**...

I am either the Architect of Record or an Architect hired to provide advice on the ADA compliance for the place of lodging identified above. By signing below, I certify that the answers to the questions on this page and the Accessibility Certification Worksheet are true and accurate to the best of my knowledge, information and belief.

| | |
|---|---|
| Date | Architect's Signature |
| Name | Firm |
| Address | City, State - Zip Code |
| Telephone Number | State Registration Number |

IV. **Contractor's Certification**...

I am the General Contractor for the place of lodging identified above. By signing below, I certify that the answers to the questions on this page and the Accessibility Certification Worksheet are true and accurate to the best of my knowledge, information and belief.

| | |
|---|---|
| Date | General Contractor's Signature |
| Name | Firm |
| Address | City, State - Zip Code |
| Telephone Number | State License Number |

V. **Licensee's Certification**...

I am the Licensee of the place of lodging identified above. I have attempted to have this form completed by an architect and general contractor. The architect and contractor refused to complete this form. I have no reason to believe they refused because of accessibility problems at the facility. By signing below, I certify that the answers to the questions on this page and the Accessibility Certification Worksheet are true and accurate to the best of my knowledge, information and belief.

| | |
|---|---|
| Date | Licensee's Signature |
| Name | Address |

HJEXC1
179820.3 Q2/05

## ADDENDUM TO THE LICENSE AGREEMENT PURSUANT TO THE
## NEW YORK GENERAL BUSINESS LAW

This Addendum to the License Agreement by and between HOWARD JOHNSON INTERNATIONAL, INC. ("we", "our" or "us") and SEVEN HILLS HOSPITALITY GROUP LLC ("you") is dated Oct. 14, 200 5.

Notwithstanding anything to the contrary set forth in the License Agreement, the following provisions shall supersede and apply:

1.  Section 9.3 is amended by adding the following statement immediately after the fourth sentence of such Section:

> However, all rights you enjoy and any causes of action arising in your favor from the provisions of Article 33 of the General Business Law of the State of New York and the related regulations shall remain in force; it being the intent of this proviso to satisfy the non-waiver provisions of General Business Law, Sections 687.4 and 687.5.

2.  Section 10 is amended by adding the following statement immediately after the first sentence of such Section:

> However, no assignment shall be made except to an assignee who, in our good faith judgment, is willing and able to assume our obligations under this Agreement.

3.  Section 17.6.1 is amended by adding the following statement immediately after the first sentence of such Section:

> The foregoing choice of law should not be considered a waiver of any right conferred upon you by the General Business Law of the State of New York, Article 33.

IN WITNESS WHEREOF, the undersigned have executed this Addendum as of the date set forth above.

WE:
HOWARD JOHNSON INTERNATIONAL, INC.

Attest: _____     By: _____
(Assistant) Secretary                          Vice President

YOU, as licensee:
SEVEN HILLS HOSPITALITY GROUP LLC

Witness: _____     By: _____
                                                    (Managing) Member

1

HJEXCI
179820.3 Q2/05

# EXHIBIT B



**Howard Johnson**

HOTELS & INNS

RICHARD M SALTZMAN
Vice President
Franchise Sales & Development

May 1, 2006

RECEIVED MAY - 3 2006

**VIA UPS**

Mr Gaurang Parikh
1300 Sedgwick Avenue
Bronx, NY 11556

Re    License Agreement dated October 14, 2005, between Howard Johnson International, Inc
("we," ' our' or 'us") and Seven Hills Hospitality Group, LLC ("you ' or ' your' ) relating
to Howard Johnson® System Unit #15561 located in Bronx, NY (the "Facility")

Dear Mr Parikh

As you know, the total number of licensed guest rooms at the Facility, as defined in Schedule B
of the License Agreement is 43  We have recently been advised that the Facility will now have
45 licensed guest rooms

So that we may update our records and reflect the correct number of licensed guest rooms, kindly
sign and acknowledge the bottom portion of this correspondence  Upon our receipt of the signed
letter, we shall amend our system and Schedule B accordingly   Also, please note that the
number of open and operating guest rooms at the Facility shall be increased accordingly

Please note that we will be unable to update our records until we receive a signed copy of this
letter back from you

Please feel free to contact me directly at 973-496-5261 if you have any questions

Sincerely,

Carol Wells
Licensing Coordinator
Franchise Administration

Agreed and acknowledged this 5th day of May , 2006

SEVEN HILLS HOSPITALITY GROUP, LLC

By _____
              (Manager)

HOWARD JOHNSON INTERNATIONAL, INC
1 Sylvan Way • Parsippany, NJ 07054 • Phone (973) 496 5257 • Fax (973) 496 5360 • rich saltzman@cendant com

# EXHIBIT C

## AMENDMENT TO LICENSE AGREEMENT

THIS "AMENDMENT" is made and entered into as of this _____ day of _____, 2008, ("Amendment Date") by and between **HOWARD JOHNSON INTERNATIONAL, INC.,** a Delaware corporation ("we", "us" or "our"), **SEVEN HILLS HOSPITALITY GROUP LLC,** a New York limited liability company ("you", or "your"), and Gaurang Parikh and Kiran Dave (the "Guarantors"). This Amendment supplements that certain License Agreement dated October 14, 2005 (the "License Agreement"), relating to a license to operate a Howard Johnson® System Unit located at 1300 Sedgwick Avenue, Bronx, NY 11556, designated as Unit #**15561-60252-01** (the "Facility"). To the extent of any conflict between the License Agreement and this Amendment, the Amendment shall control.

IN CONSIDERATION of the mutual agreements herein contained, and promises herein expressed, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the parties, it is agreed as follows:

1.      Section 18.1.2 of the License Agreement is deleted in its entirety and replaced with the following:

18.1.2  From May 1, 2008 through April 30, 2012, the Combined Fee shall be an amount equal to (i) the lesser amount of $60.00 for each approved guest room or 7% of Gross Room Revenues for each month from May 1st through March 31st of each year, and (ii) the lesser amount of $65.00 for each approved guest room or 7% of Gross Room Revenues for the month of April of each year.

2.      Confidentiality. You acknowledge that the existence of this Amendment and the granting of the benefits herein are strictly confidential between us and you. Part of the consideration received by us for granting the benefits is your obligation to maintain confidentiality about this Amendment and its benefits. Therefore, you agree not to disclose to any person or entity the existence or subject matter of this Amendment, or the benefits granted hereunder, except under compulsion of law or to attorneys or accountants as needed for assistance with representation of or advice to you. Within your organization, information about this Amendment will be disclosed to agents, officers, affiliates and contractors on a "need to know" basis only. If you violate this confidentiality obligation, no further benefits will be available from that time and thereafter, to the extent that the benefits have not then been fully utilized upon written notice from us.

3.      Release. You and Guarantors, on behalf of yourselves, your partners, officers, employees, directors, shareholders, representatives, agents and your successors and assigns, hereby release and hold harmless us, our officers, employees, *agents, directors, shareholders,* representatives, affiliates, parent entities and subsidiaries (collectively, "Releasees") and the predecessors, successors and assigns of the Releasees, from any and all claims and causes of action whatsoever arising prior to and through the date of this Amendment relating to the offer, sale, administration, negotiation, default, and/or performance of the License Agreement for the Facility.

4.   Except as expressly stated in this Amendment, no further additions, modification or deletions to the License  Agreement or the Guaranty Agreement are intended by the parties or made by this Amendment.

5.   <u>Execution in Counterparts</u>.  To facilitate execution of this Amendment by geographically separated parties, this Amendment, and all other agreements and documents to be executed in connection herewith may be executed in as many counterparts as may be required; and it shall not be necessary that the signatures on behalf of each party appear on each counterpart; but it shall be sufficient that the signature on behalf of each party appear on one or more of the counterparts.  All counterparts shall collectively constitute a single agreement.  It shall not be necessary in making proof of this Amendment to produce or account for more than a number of counterparts containing the respective signatures on behalf of all the parties hereto. All facsimile executions shall be treated as originals for all purposes.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date indicated above:

**HOWARD JOHNSON INTERNATIONAL, INC.**

By: _____
    Valerie Capers Workman
    Vice President
    Franchise Administration

**SEVEN HILLS HOSPITALITY GROUP LLC**

By: _____
    Managing Member

**GUARANTORS:**

By: _____
    Gaurang Parikh

By: _____
    Kiran Dave

2

## AMENDMENT TO LICENSE AGREEMENT

THIS "AMENDMENT" is made and entered into as of this _30_ day of _March_ 2009, ("Amendment Date") by and between **HOWARD JOHNSON INTERNATIONAL, INC.,** a Delaware corporation ("we", "us" or "our"), **SEVEN HILLS HOSPITALITY GROUP LLC,** a New York limited liability company ("you", or "your"), and Gaurang Parikh and Kiran Dave (the "Guarantors"). This Amendment supplements that certain License Agreement dated October 14, 2005 and further amended on October 29, 2008 (the "License Agreement"), relating to a license to operate a Howard Johnson® System Unit located at 1300 Sedgwick Avenue, Bronx, NY 11556, designated as Unit **#15561-60252-01** (the "Facility"). To the extent of any conflict between the License Agreement and this Amendment, the Amendment shall control.

IN CONSIDERATION of the mutual agreements herein contained, and promises herein expressed, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the parties, it is agreed as follows:

     1.    Section 18.1.2 of the License Agreement is deleted in its entirety and replaced with the following:

    18.1.2 From **March 10, 2008** through April 30, 2012, the Combined Fee shall be an amount equal to (i) the lesser amount of $60.00 for each approved guest room or 7% of Gross Room Revenues for each month from May 1st through March 31st of each year, and (ii) the lesser amount of $65.00 for each approved guest room or 7% of Gross Room Revenues for the month of April of each year.

     2.   <u>Confidentiality</u>. You acknowledge that the existence of this Amendment and the granting of the benefits herein are strictly confidential between us and you. Part of the consideration received by us for granting the benefits is your obligation to maintain confidentiality about this Amendment and its benefits. Therefore, you agree not to disclose to any person or entity the existence or subject matter of this Amendment, or the benefits granted hereunder, except under compulsion of law or to attorneys or accountants as needed for assistance with representation of or advice to you. Within your organization, information about this Amendment will be disclosed to agents, officers, affiliates and contractors on a "need to know" basis only. If you violate this confidentiality obligation, no further benefits will be available from that time and thereafter, to the extent that the benefits have not then been fully utilized upon written notice from us.

     3.   <u>Release</u>. You and Guarantors, on behalf of yourselves, your partners, officers, employees, directors, shareholders, representatives, agents and your successors and assigns, hereby release and hold harmless us, our officers, employees, agents, directors, shareholders, representatives, affiliates, parent entities and subsidiaries (collectively, "Releasees") and the predecessors, successors and assigns of the Releasees, from any and all claims and causes of action whatsoever arising prior to and through the date of this Amendment relating to the offer, sale, administration, negotiation, default, and/or performance of the License Agreement for the Facility.

4.  Except as expressly stated in this Amendment, no further additions, modification or deletions to the License  Agreement or the Guaranty Agreement are intended by the parties or made by this Amendment.

5.  <u>Execution in Counterparts</u>.  To facilitate execution of this Amendment by geographically separated parties, this Amendment, and all other agreements and documents to be executed in connection herewith may be executed in as many counterparts as may be required; and it shall not be necessary that the signatures on behalf of each party appear on each counterpart; but it shall be sufficient that the signature on behalf of each party appear on one or more of the counterparts.  All counterparts shall collectively constitute a single agreement.  It shall not be necessary in making proof of this Amendment to produce or account for more than a number of counterparts containing the respective signatures on behalf of all the parties hereto. All facsimile executions shall be treated as originals for all purposes.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date indicated above:

**HOWARD JOHNSON INTERNATIONAL, INC.**

By: _____
    Valerie Capers Workman
    Vice President
    Franchise Administration

**SEVEN HILLS HOSPITALITY GROUP LLC**

By: _____
    Managing Member

**GUARANTORS:**

By: _____
    Gaurang Parikh

By: _____
    Kiran Dave

2

# EXHIBIT D

## AMENDMENT TO LICENSE AGREEMENT

THIS "AMENDMENT" is made and entered into as of this ⏟11⏟ day of Dec, 2012, ("Amendment Date") by and between **HOWARD JOHNSON INTERNATIONAL, INC.,** a Delaware corporation ("we", "us" or "our"), **SEVEN HILLS HOSPITALITY GROUP LLC,** a New York limited liability company ("you", or "your"), and **Gaurang Parikh and Kiran Dave** (the "Guarantors"). This Amendment supplements that certain License Agreement dated October 14, 2005, October 29, 2008 and further amended on March 30, 2009 (the "License Agreement"), relating to a license to operate a Howard Johnson® System Unit located at 1300 Sedgwick Avenue, Bronx, NY 11556, designated as Unit #**15561-60252-01** (the "Facility"). To the extent of any conflict between the License Agreement and this Amendment, the Amendment shall control.

IN CONSIDERATION of the mutual agreements herein contained, and promises herein expressed, and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged by the parties, it is agreed as follows:

1.      The License Agreement is amended by adding a Section 18.8 to read as follows:

**18.8. Combined Fees.** Notwithstanding Section 7.1, you will pay a Combined Fee consisting of the Royalty, Marketing Contribution, and Rooms Sales Charge at the rates set forth in this Section. The Combined Fee excludes commissions and related service charges, guest complaint assessments, Internet and GDS Fees, the Loyalty Program Charge and other similar fees and charges described on Schedule C which must be paid as stated in this Agreement. The discount from the Royalty, Marketing Contribution, and Rooms Sales Charge set forth in Section 7 that the Combined Fee represents (the "Discount Amount") shall first be applied to the Rooms Sales Charge and any remaining Discount Amount shall be applied evenly between the Royalty and Marketing Contribution.

18.8.1 The Combined Fee shall be four and one quarter percent (4.25%) of Gross Room Revenues accruing May 1, 2012 through October 18, 2017; and

18.8.2  The Combined Fee shall be four and three quarters percent (4.75%) of Gross Room Revenues accruing October 19, 2017 through October 18, 2020; and

18.8.3 The Combined Fee shall be five and three quarters percent (5.75%) of Gross Room Revenues accruing October 19, 2020 through October 18, 2023; and

18.8.4 The Combined Fee shall be six and three quarter percent (6.75%) of Gross Room Revenues accruing October 19, 2023 through April 30, 2025; and

18.8.5  The rate changes set forth in this Section automatically terminate without notice or opportunity to cure, and the Royalty, Marketing Contribution and Rooms Sales Charge shall reset to the rates specified in Section 7, if and as of the date (i) a Termination occurs, or we send you a notice of default and you fail to cure the default within the time specified, if any, in the notice of default, or (ii) after you satisfy the Improvement Obligation, the Facility receives a quality assurance inspection score of more than 200 (or its then equivalent) and the Facility fails to achieve

a quality assurance inspection score of less than 200 in a re-inspection to be performed not less than 60 days after the initial inspection.

2.   Confidentiality. You acknowledge that the existence of this Amendment and the granting of the benefits herein are strictly confidential between us and you. Part of the consideration received by us for granting the benefits is your obligation to maintain confidentiality about this Amendment and its benefits. Therefore, you agree not to disclose to any person or entity the existence or subject matter of this Amendment, or the benefits granted hereunder, except under compulsion of law or to attorneys or accountants as needed for assistance with representation of or advice to you. Within your organization, information about this Amendment will be disclosed to agents, officers, affiliates and contractors on a "need to know" basis only. If you violate this confidentiality obligation, no further benefits will be available from that time and thereafter, to the extent that the benefits have not then been fully utilized upon written notice from us.

3.   Release. You and Guarantors, on behalf of yourselves, your partners, officers, employees, directors, shareholders, representatives, agents and your successors and assigns, hereby release and hold harmless us, our officers, employees, agents, directors, shareholders, representatives, affiliates, parent entities and subsidiaries (collectively, "Releasees") and the predecessors, successors and assigns of the Releasees, from any and all claims and causes of action whatsoever arising prior to and through the date of this Amendment relating to the offer, sale, administration, negotiation, default, and/or performance of the License Agreement for the Facility.

4.   Except as expressly stated in this Amendment, no further additions, modification or deletions to the License Agreement or the Guaranty Agreement are intended by the parties or made by this Amendment.

5.   Execution in Counterparts. To facilitate execution of this Amendment by geographically separated parties, this Amendment, and all other agreements and documents to be executed in connection herewith may be executed in as many counterparts as may be required; and it shall not be necessary that the signatures on behalf of each party appear on each counterpart; but it shall be sufficient that the signature on behalf of each party appear on one or more of the counterparts. All counterparts shall collectively constitute a single agreement. It shall not be necessary in making proof of this Amendment to produce or account for more than a number of counterparts containing the respective signatures on behalf of all the parties hereto. All facsimile executions shall be treated as originals for all purposes.

IN WITNESS WHEREOF, the parties have executed this Amendment as of the date indicated above:

**HOWARD JOHNSON INTERNATIONAL, INC.**

By:_____
    Valerie Capers Workman
    Vice President

**SEVEN HILLS HOSPITALITY GROUP LLC**

By:_____
    Managing Member

**GUARANTORS:**

By:_____
    Gaurang Parikh

By:_____
    Kiran Dave

3

# EXHIBIT E

## GUARANTY

To induce HOWARD JOHNSON INTERNATIONAL, INC., its successors and assigns ("you") to sign the License Agreement (the "Agreement") with the party named as the "Licensee," to which this Guaranty is attached, the undersigned, jointly and severally ("we, "our" or "us"), irrevocably and unconditionally (i) warrant to you that Licensee's representations and warranties in the Agreement are true and correct as stated, and (ii) guaranty that Licensee's obligations under the Agreement, including any amendments,   will be punctually paid and performed.

Upon default by Licensee and notice from you we will immediately make each payment and perform or cause Licensee to perform, each unpaid or unperformed obligation of Licensee under the Agreement. Without affecting our obligations under this Guaranty, you may without notice to us extend, modify or release any indebtedness or obligation of Licensee, or settle, adjust or compromise any claims against Licensee. We waive notice of amendment of the Agreement. We acknowledge that Section 17 of the Agreement, including Remedies, Venue and Dispute Resolution, and WAIVER OF JURY TRIAL, applies to this Guaranty.

Upon the death of an individual guarantor, the estate of the guarantor will be bound by this Guaranty for obligations of Licensee to you existing at the time of death, and the obligations of all other guarantors will continue in full force and effect.

This Guaranty may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one in the same instrument.

IN WITNESS WHEREOF, each of us has signed this Guaranty effective as of the date of the Agreement.


WITNESSES:                                  GUARANTORS:


_Linda_                          _____ (Seal)
                                              Gaurang Parikh

_Linda_                          _____ (Seal)
                                              Kiran Dave


37

HJEXC1
179820.3 Q2/05

# EXHIBIT F



# WYNDHAM

### HOTEL GROUP

Compliance Department
22 Sylvan Way
Parsippany, New Jersey 07054
Ph (973) 753-6000 fax (800) 880-9445

December 30, 2016

<u>**VIA 2 DAY DELIVERY METHOD**</u>

Mr. Kiran R. Dave
Seven Hills Hospitality Group LLC
1300 Sedgwick Avenue
Bronx, NY 10452

RE:    ACKNOWLEDGMENT OF TERMINATION of the License Agreement for Howard Johnson®
System Unit #15561-60252-1 located in Bronx, NY (the "Facility")

Dear Mr. Dave:

I am writing on behalf of Howard Johnson International, Inc. ("we" or "us") to acknowledge that Seven Hills Hospitality Group LLC ("you" or "your") has stopped operating the Facility as part of the Howard Johnson chain.  You informed us previously that you would temporarily stop accepting reservations from us and, subsequently, on December 1, 2016 (the "Termination Date") Gaurang Parikh informed us in a telephone conversation that the Facility has closed and will not re-open as a Howard Johnson.  Accordingly, we acknowledge that the License Agreement, dated October 14, 2005, as amended (the "Agreement") has terminated.

The Agreement requires you to perform certain post-termination obligations.   In addition to other obligations specified in the Agreement, by no later than ten (10) days from the delivery date of this letter, you must (a) remove all signage and other items bearing the Howard Johnson Marks; (b) perform all post-termination obligations specified in the Systems Standards Manual; (c) change all signs, billboards, and listings in telephone directories, travel guides, hotel indexes and similar materials in which the Facility is identified as a Howard Johnson facility; and (d) remove the Howard Johnson Marks from any advertising or promotional activities on, around or directed towards the Facility, including any web sites, web pages or search engines.  You must cooperate fully with us regarding any post-termination inspections by us to verify that the Facility has been properly de-identified.  You must immediately return to us all training documents, operating manuals and other proprietary material.

Because the Agreement has terminated, you must pay us Liquidated Damages of $120,532.67, as specified in Section 12.1 of the Agreement.  You must also pay any outstanding Recurring Fees and any other fees and charges through the date you complete the de-identification of the Facility.  We estimate that, as of the Termination Date, you owe us $22,685.49 in such fees and charges.  Please pay us this amount within fourteen (14) days.  You must also pay de-commission fees of $326.00 for the termination of the Connectivity Equipment Lease and Services Addendum (the "Addendum").  The Addendum also terminated on the Termination Date.  Please consider this letter to be a notice and demand for payment under any Guaranty of the Agreement, directed to your Guarantor.

















Mr. Kiran R. Dave
December 30, 2016
Page Two

Please know that, because the Agreement has terminated, you also have lost the right to continue to use the seamless interface version of your property management system. You must now make arrangements with the software vendor for a new license to use the property management system. If the Facility has WynGuest system installed, please be advised that due to the termination you will have no functionality from the system. Should you wish to continue using an independent version of the software, please contact Sabre at 877-520-3646. If your property is planning to migrate to another property management system, please contact your provider to expedite the installation. If you would like to inquire about the data maintained in the system, please contact Hotel Technology Client Support at 506-646-2521 to obtain reporting of that data.

Should you have any questions regarding this matter, please contact Charlene Martin, Senior Manager of Settlements, at (973) 753-7602.

Sincerely,

Suzanne Fenimore
Senior Director
Contracts Compliance

Enclosures

cc:   Gaurang Parikh (Guarantor) – 1000 Sunrise Highway, Rockville Centre, NY 11570
      Cynthia Liu
      Charlene Martin
      Michael Piccola
      Joe Maida

| Mon-Year | Invoice No. | Invoice Date | Description | Accrued | Billing | Amount Tax | Finance Charges | Total |
|---|---|---|---|---|---|---|---|---|
| | TA0650409 | 08/18/2016 | T/A COMMISSIONS | | 139.74 | 0.00 | 3.71 | 145.55 |
| | TC0650409 | 08/18/2016 | T/A COMM SERVICE CHG | | 24.45 | 0.00 | 0.65 | 25.47 |
| | TM0650409 | 08/18/2016 | MEMBER BENEFIT COMM | | 132.70 | 0.00 | 3.52 | 138.21 |
| | | | Sub Total: | | 2,761.71 | 28.35 | 70.76 | 2,907.50 |
| SEP-2016 | 101941 | 09/29/2016 | RETRAINFEE-SEP2016-0 | | 250.00 | 0.00 | 1.38 | 255.13 |
| | 1657152 | 09/14/2016 | GDS & INTERNET BKGS | | 24.20 | 0.00 | 0.31 | 24.87 |
| | 31200833 | 09/20/2016 | TRAINING ACCESS FEE | | 60.00 | 0.00 | 0.60 | 61.50 |
| | 43646699 | 09/29/2016 | 5715A-HughesNet VSAT | | 160.00 | 14.20 | 0.96 | 177.77 |
| | 43647683 | 09/29/2016 | 5096A-WYNNGUEST SW MAINT | | 159.58 | 14.15 | 0.96 | 177.30 |
| | 43660837 | 09/29/2016 | Accrual-1000A-ROYALTY FEE | * | 225.83 | 0.00 | 1.24 | 230.46 |
| | 43660959 | 09/29/2016 | Accrual-1210A-MARKETING FEE | * | 80.81 | 0.00 | 0.44 | 82.46 |
| | TC0657152 | 09/14/2016 | T/A COMM SERVICE CHG | | 2.64 | 0.00 | 0.03 | 2.71 |
| | TM0657152 | 09/14/2016 | MEMBER BENEFIT COMM | | 35.20 | 0.00 | 0.46 | 36.19 |
| | | | Sub Total: | | 998.26 | 28.35 | 6.38 | 1,048.39 |
| OCT-2016 | 102061 | 10/30/2016 | RETRAINFEE-OCT2016-0 | | 250.00 | 0.00 | 0.00 | 251.25 |
| | 43670987 | 10/30/2016 | 5096A-WYNNGUEST SW MAINT | | 159.58 | 14.15 | 0.00 | 174.60 |
| | 43672885 | 10/30/2016 | 5715A-HughesNet VSAT | | 160.00 | 14.20 | 0.00 | 175.07 |
| | 43688667 | 10/30/2016 | Accrual-1000A-ROYALTY FEE | * | 4,072.10 | 0.00 | 0.00 | 4,092.46 |
| | 43688668 | 10/30/2016 | Accrual-1210A-MARKETING FEE | * | 1,457.11 | 0.00 | 0.00 | 1,464.40 |
| | | | Sub Total: | | 6,098.79 | 28.35 | 0.00 | 6,157.78 |
| NOV-2016 | 102185 | 11/29/2016 | RETRAINFEE-NOV2016-0 | | 250.00 | 0.00 | 0.00 | 250.00 |
| | 43698725 | 11/29/2016 | 5715A-HughesNet VSAT | | 160.00 | 14.20 | 0.00 | 174.20 |
| | 43698934 | 11/29/2016 | 5096A-WYNNGUEST SW MAINT | | 159.58 | 14.15 | 0.00 | 173.73 |
| | 43674230 | 11/29/2016 | Accrual-1210A-MARKETING FEE | * | 1,291.37 | 0.00 | 0.00 | 1,291.37 |
| | 43674231 | 11/29/2016 | Accrual-1000A-ROYALTY FEE | * | 3,608.92 | 0.00 | 0.00 | 3,608.92 |
| | | | Sub Total: | | 5,469.87 | 28.35 | 0.00 | 5,498.22 |
| | | | Grand Total: | | 21,860.93 | 113.40 | 525.27 | 22,685.49 |

Requested By: Kristine Violette

* Please note the accruals on your account are estimates.
Make sure to promptly submit your actual gross room revenue and rooms sold.

## DE-IDENTIFICATION PROCEDURES

**You must complete each of the following immediately:**

1. Remove, replace or cover with an opaque cover the primary Facility signage and all other exterior signage bearing the Howard Johnson Marks.

2. Remove all interior signage that contains Howard Johnson Marks.

3. Change advertising billboards to remove Howard Johnson Marks, including any department of transportation or other highway signage.

4. Stop answering Facility telephone as a Howard Johnson facility.

5. Remove Howard Johnson name and Marks from any domain name, advertising and brochures.

6. Return to us or destroy all confidential operations and training manuals.

7. Remove the Howard Johnson name and Marks from the following items:

   - Guestroom supplies including door signage, ice buckets, cups etc.
   - Bathroom supplies including soap, shampoo, conditioner, etc.
   - Business cards and letterhead
   - Registration cards, folios, guest receipts, including electronic copies
   - Guestroom keys
   - Uniforms and name badges

8. Paint over or remove any distinctive Howard Johnson trade dress, paint schemes or architectural features.

9. Remove Howard Johnson name from the Facility's listing on TripAdvisor or any other online traveler review site.

10. It is prohibited to re-name the Facility with a confusingly similar name or color scheme as a Howard Johnson facility.

11. We will visit the Facility at any time after 10 days after the Termination Date to verify that you have performed these de-identification obligations.

 **Shipment Receipt**

**Transaction Date:** 30 Dec 2016      **Tracking Number:**      1Z22445X0299036022

### 1   Address Information

| Ship To: | Ship From: | Return Address: |
|---|---|---|
| Seven Hills Hospitality Group LLC | Wyndham Hotel Group - 22 Sylvan | Wyndham Hotel Group - 22 Sylvan |
| Mr. Kiran R. Dave | Kristine Violette | Kristine Violette |
| 1300 Sedgwick Avenue | 22 Sylvan Way | 22 Sylvan Way |
| BRONX NY 104521417 | Parsippany NJ 07054 | Parsippany NJ 07054 |
| | Telephone:9737537204 | Telephone:9737537204 |
| | email:kristine.violette@wyn.com | email:kristine.violette@wyn.com |

### 2   Package Information

| Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|
| 1.   Letter (Letter billable) | UPS Letter | | Reference # 1 - 006-1696 |

### 3   UPS Shipping Service and Shipping Options

| | |
|---|---|
| Service: | UPS 2nd Day Air |
| Shipping Fees Subtotal: | 17.20 USD |
|    Transportation | 16.42 USD |
|    Fuel Surcharge | 0.78 USD |

### 4   Payment Information

Bill Shipping Charges to:      Shipper's Account 22445X

| | |
|---|---|
| Shipping Charges: | 17.20 USD |

**A discount has been applied to the Daily rates for this shipment**

| | |
|---|---|
| Negotiated Charges: | 7.47 USD |
| Subtotal Shipping Charges: | 7.47 USD |
| Total Charges: | 7.47 USD |

Note: This document is not an invoice. Your final invoice may vary from the displayed reference rates.

\* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.

 **Shipment Receipt**

Transaction Date: 30 Dec 2016          **Tracking Number:**     1Z22445X0296467634

---

**1  Address Information**

| Ship To: | Ship From: | Return Address: |
|---|---|---|
| Seven Hills Hospitality Group LLC | Wyndham Hotel Group - 22 Sylvan | Wyndham Hotel Group - 22 Sylvan |
| Gaurang Parikh | Kristine Violette | Kristine Violette |
| 1000 Sunrise Highway | 22 Sylvan Way | 22 Sylvan Way |
| ROCKVILLE | Parsippany NJ 07054 | Parsippany NJ 07054 |
| CENTRE NY 115705133 | Telephone:9737537204 | Telephone:9737537204 |
| | email:kristine.violette@wyn.com | email:kristine.violette@wyn.com |

---

**2  Package Information**

| Weight | Dimensions / Packaging | Declared Value | Reference Numbers |
|---|---|---|---|
| 1.  Letter (Letter billable) | UPS Letter | | Reference # 1 - 006-1696 |

---

**3  UPS Shipping Service and Shipping Options**

| Service: | UPS 2nd Day Air |
|---|---|
| **Shipping Fees Subtotal:** | 17.20 USD |
| Transportation | 16.42 USD |
| Fuel Surcharge | 0.78 USD |

---

**4  Payment Information**

Bill Shipping Charges to:                        Shipper's Account 22445X

| | |
|---|---|
| Shipping Charges: | 17.20 USD |

**A discount has been applied to the Daily rates for this shipment**

| | |
|---|---|
| Negotiated Charges: | 7.47 USD |
| Subtotal Shipping Charges: | 7.47 USD |
| Total Charges: | 7.47 USD |

Note: This document is not an invoice. Your final invoice may vary from the displayed reference rates.

\* For delivery and guarantee information, see the UPS Service Guide. To speak to a customer service representative, call 1-800-PICK-UPS for domestic services and 1-800-782-7892 for international services.